UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA MCCOY,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>DEPUY ORTHOPAEDICS, INC.;<br>DEPUY PRODUCTS, INC.;<br>DEPUY SYNTHES, INC.;<br>JOHNSON & JOHNSON; JOHNSON<br>& JOHNSON SERVICES, INC.; and<br>JOHNSON & JOHNSON<br>INTERNATIONAL,<br><br>　　　　　　　　　Defendants. | Case No.: 22-CV-2075 JLS (SBC)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S EXPERT STEPHEN LI**<br><br>(ECF No. 44) |

Presently before the Court are Defendants DePuy Orthopaedics, Inc.; DePuy Products, Inc.; DePuy Synthes, Inc.; Johnson & Johnson; Johnson & Johnson Services, Inc.; and Johnson & Johnson International's (collectively, "Defendants") Motion to Disqualify Plaintiffs' Experts Dana Medlin and Stephen Li ("Mot.," ECF No. 44),[1] Plaintiff

---

[1] This individual case was remanded to the Southern District of California from the multidistrict litigation ("MDL") *In re: DePuy Orthopaedics, Inc. Pinnacle Hip Implant Product Liability Litigation* (MDL No. 2244), which was centralized in the Northern District of Texas before the Honorable Ed Kinkeade. The instant Motion originally was filed during the MDL proceedings in multiple individual cases, including the present one, and seeks the disqualification of two expert witnesses. Only one of the two experts, Dr.

Barbara McCoy's Opposition thereto ("Opp'n," ECF No. 69), and Defendants' Reply in support thereof ("Reply," ECF No. 82). Also before the Court are Plaintiff's Notice of Supplemental Authority in support of her Opposition (ECF No. 78); Defendants' *in camera* submission of documents supporting the Motion; Defendants' reply in support of their motion to lodge documents *in camera*, which appends materials from other individual cases remanded from the MDL relevant to the instant Motion (ECF No. 89); Defendants' Notice of Supplemental Authority in support of their Motion (ECF No. 96) (sealed); and Plaintiff's Notice of Filing Expert Report of Dr. Stephen Li (ECF No. 101). The Court held oral argument on the Motion on June 22, 2023. *See* ECF No. 100. Having carefully considered the Parties' arguments, both in their briefing and during oral argument; the evidence; and the law, the Court **GRANTS** Defendants' Motion for the reasons set forth below.

## BACKGROUND

### I. General Factual and Procedural Background

In 2008, Plaintiff "underwent a left total hip arthroplasty procedure and was implanted with a DePuy Pinnacle hip implant device with a metal-on-metal [("MoM")] Ultamet liner" (the "Pinnacle Device"), but subsequent pain and inflammation required her to undergo revision surgery in 2009. ECF No. 30 ("Am. Compl.") ¶¶ 1, 49. Plaintiff brings this action against Defendants, who "designed, manufactured, marketed, and sold" the Pinnacle Device, alleging that her injuries were the result of the Pinnacle Device's defective and unsafe design and Defendants' failure to adequately warn her and/or her physicians about the same. *Id.* ¶¶ 13, 50.

On May 24, 2011, the United States Judicial Panel on Multidistrict Litigation issued a Transfer Order centralizing pretrial proceedings of all actions involving the purportedly defective design and/or manufacture of Pinnacle Devices in the Northern District of Texas before Judge Kinkeade. *See generally* 3:11-md-02244-K (N.D. Tex.), ECF No. 1,

---

Li, has been designated in this case, so this Order addresses only the portion of the Motion concerning Dr. Li.

*available at* https://www.txnd.uscourts.gov/sites/default/files/documents/311-md-2244_1.pdf. On June 29, 2011, Judge Kinkeade issued Case Management Order ("CMO") #1, which authorized plaintiffs whose cases would be subject to transfer to directly file in the Northern District of Texas. *See* 3:11-md-02244-K (N.D. Tex.), ECF No. 20 ¶ 13, *available at* https://www.txnd.uscourts.gov/sites/default/files/documents/311-md-2244_20.pdf. On November 18, 2011, Plaintiff directly filed her action within the Northern District of Texas for inclusion in the MDL. *See* 3:11-cv-03206-K (N.D. Tex.), ECF No. 1; *see also* 22-CV-2075 JLS (SBC) (S.D. Cal.), ECF No. 1. Defendants filed the instant Motion on December 16, 2022, while this action was still part of the MDL. *See generally* Mot. Shortly thereafter, this case was transferred to this District and assigned to this Court, *see* ECF Nos. 53, 55–57, and this Court set a deadline for Plaintiff's Opposition and a hearing date for the Motion, *see* ECF No. 67.

## II. The Motion to Disqualify

Plaintiff has "designated Dr. Li as a biomedical expert, including as an expert in general and specific causation." Opp'n at 2 (footnote omitted).[2] Defendants, however, contend that Dr. Li must be disqualified because he has "'switched sides' in the exact same litigation." Mot. at 2.

The instant Motion, to the extent it concerns Dr. Li, was filed on December 16, 2022, in this and seven other individual cases then pending in the MDL. *See generally id.* Other plaintiffs in the MDL served expert reports authored by Dr. Li on Defendants in August 2021. Opp'n at 3. Plaintiff served her expert report authored by Dr. Li on Defendants in July 2022, which "offer[ed] substantially similar opinions to the previous reports he had authored, all involving the same DePuy products." *Id.*[3] However, "Defendants did not inform Plaintiff of [Dr. Li's potential conflict of interest] until the eve the motion to strike

---

[2] In citing to the briefs in this matter, the Court refers to the blue numbers stamped in the upper righthand corner of each page by the District's Case Management/Electronic Case Filing system.

[3] Elsewhere, Plaintiff states that she served an expert report authored by Dr. Li in May 2022 and disclosed him again as an expert on October 28, 2022. *See* ECF No. 60 at 4.

was filed." *Id.* at 4.[4] Defendants contend that "[t]hese cases were dormant and stayed until the September 16, 2022 scheduling order," and accordingly "there was no reason for DePuy to assess plaintiffs' expert designations until recently." Mot. at 10 n.6.

### A. Defendants' Initial Support

In support of their Motion, Defendants initially submitted only the declaration of Kenneth H. Inskeep, retired Of Counsel at Barnes & Thornburg LLP, one of the firms representing Defendants in this matter, who was one of DePuy's[5] national counsel for litigation from the early 1990s until his retirement on December 31, 2020. Declaration of Kenneth H. Inskeep ("Inskeep Decl.," ECF No. 44-1 at 4) ¶ 2. Mr. Inskeep "had a leadership role in defending the litigation against DePuy and affiliated companies involving the Pinnacle Cup System." *Id*. Mr. Inskeep declares that, "[i]n the early 1990s, Barnes & Thornburg engaged Dr. Li on behalf of DePuy as an expert in cases involving various hip devices, including the ACS and Duraloc cup systems as both a consulting and testifying expert." *Id.* ¶ 4. "From the 1990s until at least 2015, Dr. Li was one of DePuy's principal outside consulting and testifying experts, particularly on cases involving polyethylene performance." *Id.* Accordingly, "when significant litigation emerged in 2010 involving DePuy's metal-on-metal ("MoM") hip replacement options, [Mr. Inskeep] contacted Dr. Li to see if he was willing and available to consult with DePuy." *Id.* ¶ 6.

Mr. Inskeep declares that, on October 27 and 28, 2010, he met with Dr. Li in Florida "to discuss [other] litigation specifically, but also MoM hips more generally, as [he] anticipated [Defendants] might also want to use him as an expert in the litigation involving the DePuy Pinnacle MoM device." *Id.* ¶ 8. Before the meeting, "[Mr. Inskeep] supplied Dr. Li with certain medical and scientific journal articles [he] considered important and

---

[4] In the Joint Status Report, Plaintiff says that the first time the issue of Dr. Li's purported conflict was raised was on December 1, 2022. *See* ECF No. 60 at 4.

[5] As the Court noted in its June 5, 2023 Order granting Defendants' motion for permission to lodge documents for *in camera* review, the instant Motion generally refers to "DePuy" rather than specific DePuy entities. This Order will do the same.

key regulatory documents." *Id.* Mr. Inskeep declares that they discussed "MoM devices generally, including the DePuy Pinnacle device (not just the ASR), and [Mr. Inskeep's] mental impressions and potential strategies for defending MoM cases." *Id.* After this meeting, "it was decided that the Pinnacle defense team would continue to consult with Dr. Li, and that the ASR defense team would consult with different experts." *Id.* ¶ 9.

According to Mr. Inskeep, "[he] was the lawyer principally responsible for dealings with Dr. Li on the Pinnacle litigation," and "[he] had periodic discussions with Dr. Li in 2011, following up on various issues from [the October 27 & 28,] 2010 meeting, but focusing on their applicability to the Pinnacle litigation and other matters specific to the Pinnacle litigation." *Id.* ¶ 10. Mr. Inskeep declares that, "[i]n April 2011, [he] sent Dr. Li materials, including x-rays, on a specific Pinnacle case for which [Defendants] sought his analysis." *Id.* Mr. Inskeep declares that other topics of conversation with Dr. Li "included our respective analysis of new developments and journal articles, the theories of attack by Plaintiffs, refining defense themes and strategies and similar matters." *Id.* Mr. Inskeep declares that "[he] shared [his] mental impressions and other confidential and privileged information about defense strategies, the strengths and weaknesses of each side's respective cases, DePuy's product design and use, and the characteristics and complications associated with polyethylene, metal and ceramic bearing surfaces available in the DePuy Pinnacle cup system" during these discussions, and "Dr. Li assisted [him] in evaluating the parties' respective liability positions and developing DePuy's defenses based on his experience and expertise in this field and his review of the confidential information [Mr. Inskeep] provided about the relevant issues in addition to what was publicly available." *Id.* ¶ 11.

Mr. Inskeep declares that he and his colleague Barbara Meier "had a lengthy meeting with Dr. Li in Indianapolis" in August 2011 "to focus on understanding and developing defenses to issues being raised by Plaintiffs." *Id.* ¶ 12. Dr. Inskeep declares that, "[i]n advance of that meeting, [he] sent Dr. Li a package of materials that [he] thought were important to consider." *Id.* Mr. Inskeep declares that, during the meeting, "[they]

discussed in detail defense strategies . . . relating to the Pinnacle cup system," as well as "the defense of Pinnacle MoM and the larger class of MoM devices," "defensive litigation strategies to respond to the evolving scientific and medical literature regarding MoM devices, evaluation of likely Plaintiff experts and expert opinions that would be critical of metal-on-metal, and lines of attack against Plaintiff's allegations and case themes." *Id.*

Mr. Inskeep also declares that he, his colleague David Brooks, and Dr. Li were scheduled to meet on October 24, 2013, and while Mr. Inskeep was unable to attend due to a conflict, Mr. Brooks did attend and "reported to [Mr. Inskeep] that the meeting was very helpful," although Mr. Inskeep "ha[s] not found a memo summarizing this meeting among [his] files." *Id.* ¶ 13.

Dr. Li did not communicate frequently with Mr. Inskeep during the 2013 through 2015 time period, when Dr. Li was experiencing health issues; nonetheless, "[Mr. Inskeep] continued to view Dr. Li as a key resource in developing the Defendants' defenses, and continued to consult with him as developments warranted." *Id.* ¶ 14.

In August 2015, plaintiffs in the MDL disclosed that Al Burstein, Ph.D., would be one of their testifying product defect experts in the next bellwether trial. *Id.* ¶ 15. Mr. Inskeep asked Dr. Li "if he would be willing to review and critique Dr. Burstein's report to continue to assist [Defendants] in defending the Pinnacle litigation." *Id.* "[G]iven [Dr. Li's] long personal, professional and financial relationships with Dr. Burstein, [Dr. Li conveyed that] he simply was not comfortable" doing so. *Id.* Accordingly, at that time, Defendants "suspend[ed] consulting with Dr. Li in the Pinnacle litigation," although "[n]either Dr. Li nor [Mr. Inskeep] formally terminated his consultancy for Defendants and [Mr. Inskeep] understood he continued to be available to consult as an expert in Pinnacle or other matters provided Dr. Burstein was not involved as an opposing expert." *Id.*

Mr. Inskeep declares that, "[b]ecause of our long and trusted relationship, and given [Mr. Inskeep] had concluded Dr. Li was unlikely to be a testifying expert, during [their] work together on Pinnacle metal-on-metal cases [Mr. Inskeep] was unusually candid and detailed in [his] discussions with [Dr. Li]." *Id.* ¶ 16. Mr. Inskeep indicates that "Dr. Li

collaborated with [him] on developing defense themes and evidence associated with nearly all of the points included in Dr. Li's key points summary [in his expert report in this case] and much of the detail in the balance of his report." *Id.* "Accordingly, prior to rendering expert opinions for Plaintiff[], Dr. Li had already received, contributed to, and helped formulate the defense positions and strategies that relate to the very points and opinions he now renders for Plaintiff[] in this litigation." *Id.* Mr. Inskeep declares that a review of billing information in his possession indicates that Dr. Li was paid $23,500 for 47 hours of work "for his expert services relating to metal-on-metal Pinnacle cases." *Id.* ¶ 17.

### B. *Plaintiff's Opposition*

In support of her Opposition, Plaintiff offers an affidavit ("Li Aff.," ECF No. 69-2) and declaration ("Li Decl.," ECF No. 69-3) from Dr. Li to counter Mr. Inskeep's assertions. Dr. Li notes that he served on an FDA advisory panel concerning the safety classification of metal-on-metal hip implants in 2001, and that he stated during these public meetings "[his] opposition to the down classification of safety requirements for metal-on-metal total hip implants due to safety concerns from the first generation of metal-on-metal total hips and the lack of new testing data." Li Decl. ¶¶ 4–6; *see also* ECF No. 65 (partial transcript of the FDA's August 8, 2001 Orthopaedics and Rehabilitation Devices Advisory Panel Open Discussion) at 3–15. Dr. Li declares that the opinions he disclosed at that time "have never changed." Li Decl. ¶ 7. Dr. Li admits that, "[i]n the 1990s and early 2000s, [he] had worked with Depuy as a consulting polymer chemist." *Id.* ¶ 9. "[Dr. Li] was first approached by plaintiffs['] counsel in ASR metal-on-metal litigation in 2010, likely due to [his] publicly expressed opinions against metal-on-metal." *Id.* ¶ 10. "[Dr. Li] relayed to Mr. Inskeep that [he] had discussed [his] opinions of metal-on-metal with plaintiffs' counsel; however, [Dr. Li] was not formally retained by any plaintiffs['] counsel until early 2021." *Id.*

Dr. Li declares "that sometime in 2010, Mr. Inskeep notified me that he was in town, and [Dr. Li] met him for dinner and drinks at or near the airport." *Id.* ¶ 11. As best he recalls, "[they] discussed various topics over the meal, and to the small extent metal-on-

metal was brought up, [Dr. Li] reiterated the position [he] had since 2011." *Id.* And while Dr. Li affirms that he met with Mr. Inskeep and Ms. Meier in August 2011, "it is [his] recollection that the only discussions [he] ha[s] ever had with Barbara Mei[e]r were related to metal-on-polyethylene products." *Id.* ¶ 12.

As to the October 24, 2013 meeting with Mr. Brooks, Dr. Li declares that "[he] was diagnosed and treated for cancer" in 2012, and he "only slowly restarted consulting activities in September 2013." *Id.* ¶ 13. Dr. Li declares that "[he] do[es] not have any documents or information from Mr. Brooks in [his] possession and [he] do[es] not recall receiving any documents or information from Mr. Brooks, let alone confidential or proprietary information." *Id.* Dr. Li further declares that he has reviewed his e-mail account and "[is] not in possession of confidential information or medical records related to metal-on-metal hip devices from Depuy or its counsel; nor do[es he] have a recollection of receiving such information." *Id.* ¶ 14. Further, "[a]fter reviewing [his] e-mail account, [he is] not in possession of specific questions from Depuy or its counsel related to metal-on-metal; nor do[es he] have a recollection of these types of communications." *Id.* ¶ 15.

Based on the information in Dr. Li's possession, he does not believe the payments referenced in Mr. Inskeep's declaration were related to metal-on-metal devices. *Id.* ¶ 16. He also does not have in his possesion any retention agreements or confidentiality agreements with DePuy related to metal-on-metal devices, and he does not recall entering into any such agreements. *Id.* ¶ 18. Dr. Li declares that he was never under the impression that DePuy viewed him as a consulting or non-testifying expert on issues related to metal-on-metal hip products. *Id.* ¶ 19. Indeed, "in 2016, instead of contacting [him] directly, Depuy subpoenaed [Dr. Li] as a fact witness in an intellectual property matter." *Id.* He declares that "[he] never agreed to consult with Depuy as a metal-on-metal expert" and has never received confidential or proprietary information from DePuy related to such devices. *Id.* ¶ 21. Even when Dr. Li acted as a consulting expert in metal-on-polyethylene cases, "[he] did not discuss matters of litigation strategy or receive internal e-mails or confidential information other than design specifications for the particular device at issue in that case."

*Id.* ¶ 17. "In general, [he] would only receive medical records and at times design specifications for the particular device at issue from Depuy and perform a literature review on [his] own and then draft a report with [his] findings." *Id.* Dr. Li never informed any of the plaintiffs in the MDL of any conflict of interest with DePuy because he never agreed to consult with DePuy as a metal-on-metal expert and accordingly did not believe there was any conflict of interest to disclose. *Id.* ¶¶ 21–23.

Dr. Li's affidavit is largely repetitive of his declaration. *See generally* Li Aff.

### C. Other Rulings on the Motion and Defendants' in Camera *Submission*

As previously noted, the instant Motion, to the extent it implicates Dr. Li, was filed in seven other individual cases that have since been remanded from the MDL. The instant Motion already has been decided in several of those actions. First, at the end of March 2023, the court in *Winkelmeyer v. DePuy Orthopaedics, Inc.*, denied the Motion. *See generally* Case No. 13-cv-4058, 2023 WL 2719473 (W.D. Mo. Mar. 30, 2023). Only after the Motion was denied did the defendants in that action file a motion to lodge *in camera* the supporting documents referenced in the Inskeep Declaration, as well as a motion for reconsideration.[6] The court in *Winkelmeyer* denied the motion for reconsideration on the grounds that the documents submitted *in camera* were neither new evidence nor identification of a clear error meriting reconsideration. *See generally* Case No. 13-cv-4058, 2023 WL 2974480 (W.D. Mo. Apr. 17, 2023).

On May 4, 2023, the court in *Sheehy v. DePuy Orthopaedics, Inc.*, having considered the *in camera* documents submitted by the defendants, granted the Motion and afforded the plaintiff an opportunity to identify a new expert. *See* Case No. 22-cv-3370 (D. Colo.), ECF No. 139 at 3. Similarly, on May 18, 2023, the court in *England v. DePuy Orthopaedics, Inc.*, granted the Motion after taking into consideration the defendants' *in camera* submission. *See* Case No. 23-cv-40 (C.D. Cal.), ECF No. 93-1 (sealed). Finally,

---

[6] It was at that time, too, that Defendants submitted their request to lodge the documents *in camera* with this Court.

an evidentiary hearing and a hearing on the Motion were held on June 21, 2023, in *Cannon v. DePuy Orthopaedics, Inc.*, but a decision has yet to issue as of the date of this Order. *See* Docket, Case No. No. 22-cv-5152 (N.D. Ga.).

This Court granted Defendants' request to lodge *in camera* documents further supporting the instant Motion. *See* ECF No. 97. Without divulging specifics, among the *in camera* documents are a contemporaneous e-mail from Mr. Inskeep to his colleagues proposing an agenda for a 2011 meeting with Dr. Li; a contemporaneous memorandum authored by Ms. Meier comprising her notes from said meeting; and a contemporaneous e-mail from Mr. Brooks to Mr. Inskeep following a 2013 meeting with Dr. Li.

## LEGAL STANDARD

"'Courts have inherent power to disqualify experts.'" *Crenshaw v. MONY Life Ins. Co.*, 318 F. Supp. 2d 1015, 1026 (S.D. Cal. 2004) (quoting *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1082 (C.D. Cal. 2001)). "However, disqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004) (citations omitted). Further, "expert witnesses stand in shoes different from those of counsel. 'An expert does not advocate during litigation but acts as a source of information and opinion.'" *Crenshaw*, 318 F. Supp. 2d at 1026 (quoting *United States v. Salamanca*, 244 F. Supp. 2d 1023, 1024 (D.S.D. 2003)). Accordingly, "[i]t is important to remember that the expert disqualification standard must be distinguished from the attorney-client relationship." *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1092 (citations and internal quotation marks omitted).

"Courts have developed two approaches" to assessing this issue. The first approach, sometimes called the "bright-line rule," "requires disqualification 'where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention.'" *In re Bard IVC Filters Prod. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6603467, at *2 (D. Ariz. Dec. 21, 2017) (quoting *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991)).

"The second approach applies where 'the parties dispute whether the earlier retention and passage of confidential information occurred.'" *Id.* (quoting *Wang*, 762 F. Supp. at 1248). When such is the case, the court analyzes two questions: "(1) whether it was reasonable for the party seeking disqualification to believe it had a confidential relationship with the expert, and (2) whether the expert received confidential information relevant to the current litigation." *Id.* (citations omitted). If either question is answered in the negative, "disqualification is likely inappropriate." *Wang*, 762 F. Supp. at 1248. If, on the other hand, both questions are answered in the affirmative, the expert generally should be disqualified; however, the court also should consider whether disqualification would be fair to the party whose expert would be disqualified and would promote the integrity of the judicial process. *In re Bard*, 2017 WL 6603467, at *2; *Hewlett-Packard*, 330 F. Supp. 2d at 1093. The party moving to disqualify bears the burden of proof on these issues. *Hayward Property, LLC v. Commonwealth Land Title Ins. Co.*, Case No. 17-cv-06177 SBA, 2021 WL 4923379, at *2 (N.D. Cal. Aug. 31, 2021) (citing *Hewlett-Packard*, 330 F. Supp. 2d at 1096).

## ANALYSIS

Here, the Parties dispute whether Dr. Li was previously retained as an expert by Defendants in the same litigation. *See* Opp'n at 2 ("Defendants moved to disqualify Plaintiff[']s[] biomedical expert Dr. Li on the basis that Dr. Li has allegedly 'switched sides' from Defendants to Plaintiff[] in this litigation. He did not."). Accordingly, application of the bright-line rule is inappropriate here, and the Court instead turns to the alternate test for disqualification.

### I. Objectively Reasonable Belief that a Confidential Relationship Existed

In assessing whether the party seeking disqualification had an objectively reasonable belief that a confidential relationship with the expert existed, courts consider a number of factors, including the length of the relationship; the number and frequency of contacts and meetings between the party and the expert; whether the parties entered into any formal confidentiality agreement; whether the expert was retained by the party to assist in the

litigation; whether work product was discussed with or documents provided to the expert; which way any alleged confidential communications flowed (from the expert to the party or vice-versa); whether the expert was paid any fee; whether the expert was asked to not discuss the case with the opposing party or counsel; and whether any of the expert's ideas were derived from work done under the party's direction.  *See Hewlett-Packard*, 330 F. Supp. 2d at 1093 (citations omitted).

Here, both Defendants and Dr. Li acknowledge that Dr. Li was a consulting polymer chemist to DePuy from the 1990s until at least the early 2000s, *see* Li Decl. ¶ 9; Inskeep Decl. ¶ 4, and was paid by DePuy for consulting, *see* Li Decl. ¶ 16; Inskeep Decl. ¶ 17; accordingly, it certainly was objectively reasonable for Defendants to have believed that a confidential relationship existed between DePuy and Dr. Li at some point.  *See, e.g.*, *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2014 WL 6960396, at *10 (S.D. W. Va. Dec. 8, 2014) (finding objectively reasonable expectation of confidential relationship where relationship lasted nearly four years and involved frequent contacts).

Moreover, Defendants' *in camera* submission evidences that it was objectively reasonable for Defendants to believe that a confidential relationship existed between DePuy and Dr. Li in the timeframe during which this litigation was pending.  Although the Court finds troubling the lack of formal confidentiality and retention agreements between DePuy and Dr. Li, ultimately, such documents are not prerequisites to the formation and existence of a confidential relationship, but merely one factor to be considered. Meanwhile, the contemporaneous documents submitted by Defendants show that DePuy provided Dr. Li with documents related to litigation during this timeframe; that they paid him consulting fees; that they paid for his travel and lodging for at least one consulting meeting; and that work product and litigation strategy was likely discussed with Dr. Li during several meetings.

While Dr. Li's declaration and affidavit state that he has no **recollection** of Mr. Inskeep or any other lawyer for DePuy sharing confidential or privileged information with

him related to the instant litigation, *see* Li Aff. ¶¶ 9–12; Li Decl. ¶¶ 11–17, 21, the contemporaneous documents submitted by Defendants tend to show that such information was shared.  Further, while Dr. Li says he does not recall having any discussions with Ms. Meier concerning metal-on-metal devices, *see* Li Decl. ¶ 12, her contemporaneous notes from the August 2011 evidence otherwise.  Memories fade, and, as counsel for Plaintiff conceded during oral argument, documents created more or less at the time of the events in question are simply more reliable than Dr. Li's recollections more than a decade later.

During oral argument, Plaintiff's counsel urged the Court to review several cases cited by Defendant, which Plaintiff's counsel insisted were distinguishable.  Specifically, Plaintiff's counsel noted that in *Simons v. Freeport Memorial Hospital*, unlike here, the expert who was disqualified had "rendered some type of oral opinion."  No. 06 C 50134, 2008 WL 5111157, at *4 (N.D. Ill. Dec. 4, 2008).  However, that was solely one factor relevant to the court finding that a confidential relationship existed.  *See id.* ("In light of the ***facts*** above, it was reasonable for defendants to assume a confidential relationship.") (emphasis added).  Ultimately, there are more similarities than differences between *Freeport* and this case.  For example, the expert in *Freeport* was paid for 20 hours of consultation services, *see id.*, and Dr. Li was paid for 47 hours—more than twice that, *see* Inskeep Decl. ¶ 17.  The expert in *Freeport* did not solely provide an "initial consultation," but "continued to provide consultation to defendants" over a period of three months.  *Freeport*, 2008 WL 5111157, at *3.  Here, Dr. Li met and consulted with counsel for DePuy multiple times over a period of years.  *See generally* Inskeep Decl.  It also appears, like here, that there was no formal written contract cementing the consulting relationship in *Freeport*.  *See Freeport*, 2008 WL 5111157, at *3 ("In contrast to plaintiff's suggestion otherwise, a written contract is not the only way a party can reasonably assume a confidential relationship with an expert.") (citation omitted).  In sum, the facts supporting the existence of a confidential relationship here are even more compelling than those in *Freeport*.

/ / /

Plaintiff's counsel also pointed to *Rhodes v. E.I. du Pont de Nemours & Co.*, where the court disqualified an expert where there was a signed retention letter, the expert had discussed the case by phone approximately 28 times with counsel, and counsel gave the expert a memorandum summarizing the relevant facts "as well as counsel's views on that case's key issues and strategies." 558 F. Supp. 2d 660, 668 (S.D. W. Va. 2008). While certain factors supporting the existence of a confidential relationship are present in *Rhodes* that are absent here, the converse is also true. For instance, the relationship in *Rhodes* potentially lasted only months, whereas here the relationship spanned years. *Id.* at 671. And here there were several lengthy in-person meetings between DePuy's counsel and Dr. Li that further support a finding that "[t]his history of interactions does not indicate a sporadic or informal relationship." *Id.*

Ultimately, having considered the evidence and the relevant factors, the Court finds that Defendants have met their burden of establishing their reasonable belief that a confidential consulting relationship existed between DePuy and Dr. Li.

## II. Disclosure to the Expert of Confidential Information Relevant to the Litigation

A finding that an objectively reasonable belief in a confidential relationship existed does not end the Court's inquiry, however, as "[s]econd, the moving party must establish that it in fact disclosed confidential information to the expert." *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1083 (C.D. Cal. 2001) (citations omitted). "Confidential information essentially is information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege.'" *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (citations omitted). Said confidential information must be "relevant to the current litigation." *Id.* at 1096; *see Junger v. Singh*, 514 F. Supp. 3d 579, 598 (W.D.N.Y. 2021) ("[T]he party seeking disqualification [must] show that . . . during the relationship there [must have been] a disclosure of confidential or privileged information to the expert that is relevant to the current litigation." (citation and internal quotation marks omitted)).

/ / /

"Courts are more likely to find for the moving party if any of the following information is shared: legal strategies, the types of experts to be called, the attorney's views on the relative strengths or merits of a claim or defense, the role of other witnesses at trial or anticipated defenses." *Stencel*, 174 F. Supp. 2d at 1083 (citing *Koch Refining Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996)). The proponent of disqualification "should point to specific and unambiguous disclosures that if revealed would prejudice the party." *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (citations omitted); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 721 F. App'x 580, 584 (9th Cir. 2017) (finding district court abused its discretion where defendant failed to meet this burden). Communications with experts, unlike attorney-client communications, carry no presumption of confidentiality. *Stencel*, 174 F. Supp. 2d at 1083 (citation omitted). "[T]he party requesting disqualification may not meet its burden with mere conclusory or *ipse dixit* assertions." *Hewlett-Packard*, 330 F. Supp. at 1096 (quotation marks and citation omitted).

Plaintiff's counsel submitted during oral argument that Defendants have failed to pinpoint any confidential information contained within Dr. Li's expert report. During the hearing, the Court requested, and Plaintiff subsequently filed, a copy of Dr. Li's expert report, given that Mr. Inskeep's declaration asserts that Dr. Li helped develop defense themes and evidence relevant to certain points addressed in the report. *See* Inskeep Decl. ¶ 16. The Court cannot make a determination as to whether the report itself discloses confidential information conveyed by DePuy's counsel to Dr. Li; however, that is not the relevant inquiry for purposes of the present Motion. The fact remains that other documents tend to evidence that attorney work-product information related to the instant litigation was shared between DePuy's counsel and Dr. Li, which is the relevant inquiry.

While it is true, as Plaintiff's counsel argued during oral argument, that Defendants' Motion and the publicly filed supporting documents may speak "in generalities" about the allegedly confidential information disclosed, the *in camera* documents are more specific in their content. Here, Defendants have "provide[d] . . . contemporaneous documentation

that attorney work product was communicated to [the expert] or from other persons, including Defendants' counsel, who were parties to such discussions." *Hinterberger v. Catholic Health Sys., Inc.*, No. 08-CV-380S F, 2013 WL 2250591, at *15 (W.D.N.Y. May 21, 2013) (citing *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1249 (E.D. Va. 1991)).  In particular, it seems more likely than not, in view of the *in camera* documents, that privileged and confidential information was shared with Dr. Li at the August 2011 meeting between Dr. Li, Mr. Inskeep, and Ms. Meier, based on the agenda for and Ms. Meier's notes taken during the meeting, as well as at the October 2013 meeting between Dr. Li and Mr. Brooks, based on comments contained in a contemporaneous e-mail between Mr. Brooks and Mr. Inskeep about the meeting.  As noted *supra* at Section I, these contemporaneous documents are inherently more reliable than Dr. Li's recollections of events.  Even if Dr. Li was not provided a confidential and privileged written memorandum, as in *Rhodes*, 558 F. Supp. 2d at 671, these documents evidence that attorney work-product information relevant to this case was disclosed to Dr. Li.

Accordingly, on this record, the Court finds Defendants have met their burden of showing that confidential information relevant to the instant litigation was disclosed by DePuy's counsel to Dr. Li.

**III.   Nonwaiver**

"In addition to proving the elements discussed above, '[t]he party seeking disqualification bears the burden of establishing . . . its non-waiver.'" *Junger*, 514 F. Supp. 3d at 599 (citing *Eng. Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1501–02 (D. Colo. 1993); *Hinterberger*, 2013 WL 2250591, at *24 (W.D.N.Y. May 21, 2013); *Barrett v. United States*, 651 F. Supp. 606, 607 (S.D.N.Y. 1986)).

Here, Plaintiff claims that, by waiting approximately sixteen months to so much as mention Dr. Li's conflict, Defendants have waived the right to seek disqualification. Opp'n at 6.  Defendants counter that Plaintiff knew or should have known of the conflict and accordingly there was no prejudice, and, at any rate, the MDL cases were stayed until
/ / /

September 2022, so there was no reason for Defendants to assess Plaintiff's expert designations before then. Mot. at 10 n.6.

As an initial matter, Defendants' contention that "these cases were dormant and stayed until the September 16, 2022 scheduling order," and that accordingly there was no reason to assess Plaintiff's expert designations prior to that time, rings hollow. *See id*. In a June 17, 2022 filing from before this matter was transferred to this District, Defendants indicated that "[they] sent Plaintiff three separate deficiency notices relating to Plaintiff's failure to comply with CMO 12, including, in pertinent part, one in July of 2021 that pertained to Plaintiff's failure to submit complete medical records . . . and one in August of 2021 pertaining to Plaintiff's failure to submit case-specific expert reports on theories of product defect." ECF No. 24 at 1. In the same filing, Defendants argue that "Plaintiff's obligation to comply with CMO 12 was reinstated January 1, 2022, and that Plaintiff's case should be dismissed for failure to timely serve her case-specific expert reports." *Id.* at 2. Defendants clearly were on the lookout for expert reports during the time of the alleged stay and therefore could and should have raised Dr. Li's conflict of interest earlier.

Ultimately, "the only relevant communication of an objection to a challenged expert or consultant's services to an opponent is not to the objected expert or consultant, or, for that matter, to the opponent's counsel, but to the court by a formal request to disqualify." *Hinterberger*, 2013 WL 2250591, at *24 (citing *English Feedlot, Inc.*, 833 F. Supp. 2d at 1504). "While it may be the case that [Plaintiff] initially ran the risk of disqualification by hiring an expert who had a previous relationship with [Defendants], once [Defendants] became aware that [Dr. Li] was working for [Plaintiff], it was incumbent upon them to timely raise the issue for prompt resolution by the Court." *Junger*, 514 F. Supp. 3d at 599.

Here, at the latest, Defendants knew in the instant case that Dr. Li was to be one of Plaintiff's experts in July 2022, the latter of the dates on which Plaintiff may have provided Defendants with her expert report authored by Dr. Li; Defendants then waited approximately five months, until December 2022, to raise the issue. Moreover, Defendants knew that Dr. Li was going to be an expert for other plaintiffs in other cases in the same

MDL in August 2021, and still failed to voice concerns about a conflict of interest earlier than December 2022. If Defendants had concerns about Dr. Li's possession of confidential information relevant to this action, they should have promptly raised the issue with Plaintiff and, barring agreement to withdraw Dr. Li as an expert, promptly filed a motion to disqualify. Defendants' failure to act for months, if not more than a year, tends to support an inference that they waived the right to challenge Dr. Li on this basis. *See, e.g.*, *Eng. Feedlot, Inc.*, 833 F. Supp. at 1504–05 (noting party seeking disqualification had eight months after expert's deposition to move for disqualification, and failure to do so was "a mere tactical maneuver" that "does not manifest a genuine concern about confidentiality"); *Wis. Loc. Gov't Prop. Ins. Fund v. CH2M Hill, Inc.*, No. 02-C-302-DRH, 2005 WL 8165822, at *2 (E.D. Wis. Dec. 8, 2005) (finding waiver argument convincing where parties had opportunity to discuss conflict of interest at time of expert witness disclosures but waited to raise the argument until trial was a month away).

On the other hand, as the Court noted during oral argument, cases finding waiver of the right to seek disqualification are rare, and this Court has been able to locate no such cases involving a case that was part of a multidistrict litigation where other courts have already disqualified the expert. Given that two other courts have rejected the argument that Defendants waived disqualification, this Court is disinclined to find a waiver here.

**IV.   Fairness to the Nonmovant and the Promotion of Judicial Integrity**

Even if Defendants meet their burden of proof on the above issues, the Court must also balance other important considerations in assessing the propriety of disqualification. "[T]he court's interest in protecting and preserving the integrity and fairness of the judicial proceedings . . . has been used to override the other two [disqualification factors] where necessary." *Freeport*, 2008 WL 5111157, at *2 (citing *Am. Empire Surplus Lines Ins. Co. v. Care Ctrs., Inc.*, 484 F. Supp. 2d 855, 857 (N.D. Ill. 2007); *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.*, 734 F. Supp. 334, 337 (N.D. Ill. 1990); *Koch Refining Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996)).

/ / /

Here, the record evidences that Plaintiff and her counsel are not to blame for the present conflict of interest, and disqualification is indisputably prejudicial to Plaintiff. Not only must Plaintiff now find a new expert, but the Court also must reopen or extend expert discovery in a case that was initially filed more than eleven years ago, and Plaintiff's counsel confirmed during oral argument that he has already expended significant resources in consulting with Dr. Li and having him prepare his expert report in this matter. The Court is also sympathetic to Plaintiff's counsel's point, raised during oral argument, that it is difficult to find an expert with such a long and public history supporting the opinions rendered in the case, a factor juries often consider favorably in assessing an expert witness's credibility.

However, considerations of judicial integrity tip the balance in favor of disqualification. On the one hand, the Court harbors misgivings that granting Defendants' Motion raises legitimate concerns about condoning possible gamesmanship, despite Defendants' counsel's assurances to the contrary during the hearing. On the other hand, however, the Court has serious concerns that any outcome other than disqualification would have a deleterious impact on judicial integrity given that two other courts already have disqualified Dr. Li from serving as a plaintiff's expert witness in cases remanded from the same MDL. In light of the Court's findings that a confidential relationship existed between DePuy and Dr. Li, and that confidential information relevant to this litigation was almost certainly exchanged with him, the Court must endeavor to prevent any appearance of an expert "switching sides" in the same litigation and, advertently or not, potentially disclosing information that could provide the other side with a litigation advantage. Accordingly, the Court finds, on balance, that disqualification is the appropriate course of action here, given the unique circumstances of this case in the MDL context. *See Am. Empire Surplus*, 484 F. Supp. 2d at 857 (disqualifying expert despite the fact that testimony was "clear that no confidential information was provided to [the expert]" because "the unique facts of this case make disqualification appropriate" where permitting expert to

///

testify would "undermine[] public confidence in the integrity and fairness of the judicial process").

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' Motion to Disqualify Plaintiff's Expert Stephen Li (ECF No. 44). <u>On or before July 24, 2023</u>, the Parties **SHALL MEET AND CONFER** concerning, and **SHALL FILE**, a proposed scheduling order of revised dates and deadlines in light of Plaintiff's need to obtain a new expert. Further, <u>on or before August 14, 2023</u>, the Parties **SHALL MEET AND CONFER** concerning and **SHALL FILE** a Joint Status Report, *not to exceed <u>ten (10) pages</u> in length*, apprising the Court of which pending *Daubert* motions (ECF Nos. 40 & 41) require rebriefing under Ninth Circuit law and the reasons therefor.

**IT IS SO ORDERED.**

Dated: July 14, 2023

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge