UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BARBARA MCCOY,

Plaintiff,

v.

DEPUY ORTHOPAEDICS, INC.;
DEPUY PRODUCTS, INC.;
DEPUY SYNTHES, INC.;
JOHNSON & JOHNSON; JOHNSON
& JOHNSON SERVICES, INC.; and
JOHNSON & JOHNSON
INTERNATIONAL,

Defendants.

Case No.:  22-CV-2075 JLS (SBC)

**ORDER ON MOTION FOR
SUMMARY JUDGMENT AND
*DAUBERT* MOTIONS**

(ECF Nos. 123, 124, 126, 127, 128, 129, 130)

Presently before the Court are the Parties' *Daubert* Motions (ECF Nos. 124, 126, 127, 128, 129, 130) and the Motion for Summary Judgment (ECF No. 123) filed by Defendants DePuy Orthopaedics, Inc.; DePuy Products, Inc.; DePuy Synthes, Inc.; Johnson & Johnson; Johnson & Johnson Services, Inc.; and Johnson & Johnson International (collectively, "Defendants" or "DePuy"). The Court heard oral argument on March 21, 2024, and thereafter took the Motions under submission. Having carefully considered the Parties' arguments, the evidence, and the law, the Court rules as follows.

/ / /

1

**BACKGROUND**

## I.   Factual Background

Plaintiff Barbara McCoy had her right hip replaced in 2002.  *See* ECF No. 123-2 at 94:14–16.[1]  Before the surgery, she researched various medical implant devices and "concluded that [she] did not like metal on metal [("MoM")] [implants] because of the ions that are exuded" and the associated "carcinogenic impact."  *Id.* at 127:2–4, 128:11–13. After Plaintiff relayed those concerns, her surgeon, Dr. William Bugbee, opted to use a "titanium on polyethylene" device.  *Id.* at 128:10–16.

On May 23, 2008, Plaintiff underwent a procedure on her *left* hip, during which Dr. Bugbee used a DePuy Pinnacle hip implant device with an MoM Ultamet liner ("Pinnacle MoM Device").  *Id.* at 94:17–22; ECF No. 133-2 at 58:17–25, 60:5–9. Dr. Bugbee generally received his information regarding the risks associated with medical devices from "the hip and knee replacement community," including through his "colleagues," through "specialty meetings," and from "designers of the device[s]."  *Id.* at 120:9–17.   Though Dr. Bugbee "at some point" reviewed DePuy's materials, *id.* at 104:10–18, he did not consult them while selecting the Pinnacle MoM Device for Plaintiff, *id.* at 128:25–129:6.  Plaintiff did not re-communicate her concerns about MoM implants to Dr. Bugbee ahead of the 2008 surgery, and she did not learn that an MoM device had been used until after the procedure.  ECF No. 123-2 at 128:22–129:5.

"[A]bout a month" later, Plaintiff noticed that her "left hip didn't feel right," so she "began asking around."  *Id.* at 11:16–22.  Specifically, she asked Dr. Bugbee whether "he was aware of any problems with the prosthetic," but he did not end up "hav[ing] any information."  *Id.* at 11:23–24, 13:19.  Plaintiff continued "ha[ving] problems" with her left hip, which included "some swelling around the hip area."   ECF No. 123-6 at 65:23–66:4.  By February of 2009, Dr. Bugbee suspected that Plaintiff was experiencing

---

[1] Citations throughout this Order to the Parties' briefing refer to the internal pagination provided by the Parties.  Citations to deposition transcripts or other exhibits likewise correspond to each document's internal pagination and line numbers.

2

"metal hypersensitivity." ECF No. 133-2 at 68:2–17.

In March of 2009, Plaintiff sought a second opinion regarding her left-hip difficulties from Dr. Scott Taber Ball. ECF No. 123-6 at 66:5–13. Dr. Ball went on to perform revision surgery on Plaintiff's left hip in early May. *See id.* at 88:3–19. During the surgery, Dr. Ball discovered "a very large amount of fluid in the deep hip area," approximately a liter of which was removed. ECF No. 133-8 at MCCOY000076. Dr. Ball also replaced the MoM components of Plaintiff's implant with ceramic-on-polyethylene parts. *See id.*; ECF No. 123-6 at 92:9–10.

After performing the 2009 procedure, Dr. Ball—like Dr. Bugbee—came to attribute Plaintiff's left hip replacement failure to an "apparent hypersensitivity reaction to metal byproduct." ECF No. 133-8 at MCCOY000075. Plaintiff continued experiencing problems with her left hip after the revision surgery, and she ultimately underwent a second revision on August 16, 2016. *See generally* ECF No. 133-10.

Plaintiff testified that she "didn't know what was wrong with [her] . . . until [she] got an email one day around the beginning of 2010 saying that if [she] had received a DePuy hip prosthetic after 2005, that [she] might be liable [sic] for compensation." ECF No. 123-2 at 10:15–20. The same year,[2] Plaintiff had a "chance" encounter with a DePuy sales representative. *See id.* at 11:24–25, 14:3–6, 15:1–15. When she asked the representative about issues relating to her implant, Plaintiff "was given no, no, no, no, that's -- you know, shouldn't be related to the hip prosthetic." *Id.* at 12:1–3. After that, Plaintiff "started investigating on [her] own." *Id.* at 12:4–5. She then consulted with "two different law firms" before eventually retaining an attorney at some point in 2010.

In this action, Plaintiff alleges the Pinnacle MoM Device—"designed, manufactured, marketed, and sold" by Defendants—had a defective design, and that Defendants failed to adequately warn her and/or her physicians about the same. *See* ECF

---

[2] It is unclear from the record when, in relation to the other events discussed in this paragraph, Plaintiff received the email regarding DePuy's alleged wrongdoing.

No. 30 ¶¶ 13, 50.

## II.     Procedural Background

On May 24, 2011, the United States Judicial Panel on Multidistrict Litigation ("MDL") issued a Transfer Order centralizing pretrial proceedings of all actions involving the purportedly defective design and/or manufacture of Pinnacle Devices in the Northern District of Texas before the Honorable Judge Ed Kinkeade (the "MDL Court"). *See* 3:11-md-02244-K (N.D. Tex.), ECF No. 1. On June 29 of that year, the MDL Court issued Case Management Order ("CMO") #1, which authorized plaintiffs whose cases would be subject to transfer to directly file in the Northern District of Texas. *See* 3:11-md-02244-K (N.D. Tex.), ECF No. 20 ¶ 13. Pursuant to CMO #1, Plaintiff directly filed her action within that District for inclusion in the MDL on November 18, 2011. *See* ECF No. 1.

Per the MDL Court's September 16, 2022, Scheduling Order ("MDL Sched. Order," ECF No. 26), "[a]ll dispositive motions or *Daubert* motions" were due by December 16, 2022. *See* MDL Sched. Order at 2. Accordingly, the Parties filed dueling *Daubert* motions on December 15. *See* ECF Nos. 40, 41. The next day, Defendants submitted a motion seeking to disqualify another of Plaintiff's experts: Dr. Stephen Li. *See* ECF No. 44 ("Li Motion"). No dispositive motions were filed.

On December 30, 2022, the instant action was transferred and assigned to this Court. *See* ECF Nos. 53, 55–57. The motions detailed in the preceding paragraph remained pending at that time. After receiving input from the Parties, the Court issued an Order setting a hearing on (1) the Li Motion; and (2) certain choice-of-law issues that Defendants had raised in relation to the pending *Daubert* motions. *See* ECF Nos. 65, 67.

In the Li Motion, Defendants argued Dr. Li—a biomedical expert—should not be allowed to testify as Plaintiff's expert because, "[f]rom the 1990s until at least 2015, Dr. Li was one of DePuy's principal outside consulting and testifying experts." ECF No. 44-1 ¶ 4. This Court ultimately granted the Li Motion and ordered the Parties to propose an amended scheduling order in light of Plaintiff's need to obtain a new expert. *See* ECF No. 103 at 20. Plaintiff later designated Mari Truman as Dr. Li's replacement.

On the choice-of-law issue, Defendants argued the *Daubert* motions filed in the MDL would need to be re-briefed using Ninth Circuit precedent.  ECF No. 65 at 3.  For her part, Plaintiff sought to have the Court apply the MDL Court's rulings from the bellwether cases, which were conducted during the consolidated proceedings, as "the parties had essentially re-filed the *Daubert* motions that were filed" in those cases.  *Id.*

Responding to the Parties' concerns, the Court explained that California substantive law and federal procedural law from the Ninth Circuit would apply in this action.  ECF No. 67 at 2.  But the Court also observed that, in MDL cases, (1) "the rulings of the transferor court are generally considered law of the case"; and (2) "courts tend to be loath to revisit generally applicable legal issues already decided, even if decided under different circuit law."  *Id.* at 3.  Considering those principles and the "interests of comity and efficiency," the Court noted it was "disinclined to revisit rulings made by the MDL court to the extent they are generally consistent with California and Ninth Circuit authority."  *Id.*

The Court then ordered Defendants to file additional briefing explaining why "this Court must redecide under Ninth Circuit law issues previously determined . . . in the MDL."  *Id.*  In response, Defendants argued the MDL Court's rulings did not constitute law of the case and could not be squared with precedent.  *See generally* ECF No. 68.  Defendants did not, however, argue that any of the MDL Court's *Daubert* rulings ran afoul of binding Ninth Circuit authority.  Plaintiff did not weigh in on these choice-of-law matters, though the Court had invited her to do so.  *See* ECF No. 67 at 3.

Next, the Court ordered the Parties to file a joint status report explaining *which* of the pending motions required re-briefing.  *See* ECF No. 103.  Defendants identified, among others, Drs. Albert Burstein, Minnette Drumwright, David Kessler, and Steven Naide as the at-issue experts.  ECF No. 106 at 2–4.  Defendants claimed there was relevant Ninth Circuit authority that justified departing from the MDL Court's rulings regarding the first three experts.  *See id.*  Meanwhile, Defendants wished to challenge Dr. Naide—though they had not done so during the MDL—because he had been deposed only recently.  *Id.* at 2.  Plaintiff argued that any challenge to Dr. Naide would be untimely.  *Id.* at 5–6.

With the Parties' arguments in hand, the Court granted Defendants leave to file motions challenging the above experts. *See generally* ECF No. 109. Noting Defendants' failure to cite any Ninth Circuit cases that supposedly contradicted the MDL Court, however, the Court warned Defendants that the MDL Court's decisions would be considered "highly persuasive" given the similarities between the bellwether cases and this action. *Id.* at 5. The instant Motions followed on December 15, 2023.

## LEGAL STANDARDS

### I.   Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing there is a genuine dispute for trial. *Id.* at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and

6

admissions on file,' designate 'specific facts'" that would allow a reasonable factfinder to return a verdict for the non-moving party.  *Celotex*, 477 U.S. at 324.

## II.    *Daubert* **Motions**

The standard for expert testimony relevant here is set forth in Federal Rule of Evidence 702, as interpreted by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny.  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Civ. P. 702.  *Daubert* and subsequent cases have interpreted Rule 702 as requiring that evidence be both relevant and reliable.  509 U.S. at 589–95.  *Daubert* analysis thus "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592–93; *see also* Fed. R. Evid. 703.

"A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  That said, courts generally consider *Daubert*'s non-exhaustive list of factors.  *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002), *overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014).  These factors include: "(1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether

there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Id.* This inquiry is flexible by design, and "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on five grounds: (1) Plaintiff's claims are time-barred; (2) her warning- and fraud-based claims fail for lack of evidence as to causation; (3) her manufacturing defect claims fail for lack of evidence of such a defect; (4) her claim for breach of implied warranty fails for lack of privity; and (5) her claim for design defect sounding in strict liability is barred by California law. *See generally* ECF No. 123. Plaintiff responds in part that she no longer plans to pursue "her claims for manufacturing defect, breach of implied warranty, or design defect sounding in strict liability." ECF No. 133 at 11. For the reasons below, the Court will **GRANT IN PART AND DENY IN PART** Defendants' Motion.

## I. Legal Framework

The MDL Court ordered that all dispositive motions and *Daubert* motions in this case be filed by December 16, 2022. *See* MDL Sched. Order. A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Good cause exists when a deadline 'cannot reasonably be met despite the diligence of the party seeking the extension.'" *McBroom v. Johnson & Johnson*, No. CV-20-02127-PHX DGC, 2021 WL 965327, at *2 (D. Ariz. Jan. 15, 2021) (quoting Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment). The focus of Rule 16(b)'s "good cause" inquiry is thus "upon the moving party's reasons for" and "diligence" in "seeking modification." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). If the moving "party was not diligent, the inquiry should end." *Id.* Courts, however, maintain discretion to consider untimely summary judgment motions where "appropriate and efficient." *Dayton Valley Invs., LLC v. Union Pac. R. Co.*, 664 F. Supp. 2d 1174, 1179 (D. Nev. 2009).

## II.    Discussion

### A.    Timeliness

Defendants do not acknowledge in their Motion that a dispositive motion deadline existed, let alone request an extension.  The failure to seek a modification of the MDL Scheduling Order is itself grounds to deny the Motion.  *See C.F. v. Capistrano Unified Sch. Dist.*, 647 F. Supp. 2d 1187, 1190 (C.D. Cal. 2009) ("[A] party wishing to file an amended pleading after the time set by the scheduling order must specifically request that the court modify the scheduling order."), *aff'd*, 654 F.3d 975 (9th Cir. 2011).

At oral argument, Defendants' counsel explained that they did not believe a modification was necessary because it seemed the deadline had already been extended.  Specifically, Defendants pointed to a Revised Scheduling Order issued by this Court on July 25, 2023, which required "[a]ll other pretrial motions" to be filed by December 1, 2023.[3]  ECF No. 105 ¶ 10.  Defendants reportedly thought said provision applied to dispositive motions as well as other matters.

The Court has difficulty crediting Defendants' excuse.  For one thing, the language they cite—which is commonly used in scheduling orders issued in this District—is *immediately* followed by a disclaimer: "***None of these dates will prejudice any Party's right to raise timeliness as part of a motion to exclude an expert or deny a dispositive motion or an opposition thereto.***"  *Id.* ¶ 11 (emphasis in original).  Moreover, the Court cannot help but note that when Defendants perceived the need to file *Daubert* challenges not raised in the MDL—and re-brief the motions they had previously submitted— Defendants voiced their wishes early and often.  *See, e.g.*, ECF No. 60 at 4–5; ECF No. 65 at 4; ECF No. 68 at 4–9; ECF No. 106 at 2–4.  At no point during that lengthy campaign did Defendants move for a new dispositive motion deadline.

/ / /

---

[3] Magistrate Judge Chu later granted a joint motion from the Parties to extend the deadline to December 15, 2023.  *See* ECF No. 120.

1  Their failure to seek the Court's leave aside, Defendants have not established good

2  cause.  Addressing the issue for the first time in their Reply, Defendants contend good

3  cause exists because "discovery was nowhere near completed" by the MDL Court's

4  deadline.  ECF No. 142 at 2.  Defendants claim Plaintiff produced supplemental discovery

5  relating to their statute-of-limitations defense in April and September of 2023.  *Id.* at 3.

6  Defendants also argue their "warning-specific arguments" hinge on the deposition of

7  Dr. Bugbee, which occurred on January 17, 2023.  *Id.*

8  Defendants' explanations are too little, too late.   Their statute-of-limitations

9  argument is premised almost entirely on Plaintiff's deposition, *see* ECF No. 123 at 4–6,

10  which took place on November 3, 2022—a month and a half before the original deadline.

11  While Defendants point to additional discovery provided later, they conspicuously do not

12  claim this discovery impacted their ability to bring the Motion.  And even if Defendants

13  could not have filed in 2022, they certainly could have filed sooner than *December* of 2023.

14  Indeed, Defendants cite the timing of Dr. Bugbee's deposition, but it occurred *eleven*

15  *months* before Defendants filed the Motion.   As Defendants have not demonstrated

16  diligence, the Court's inquiry ends.  *See Johnson*, 975 F.2d at 609.

17  ### B.  *Judicial Economy*

18  Alternatively, Defendants argue the Court should consider at least their statute-of-

19  limitations and warning/fraud-causation arguments, as doing so would resolve many of the

20  disputed issues in this case.  *See* ECF No. 142 at 4.  Given some of their prior actions,[4]

21  Defendants' appeal to judicial economy tests the Court's patience.  That aside, judicial

22  economy cannot salvage Defendants' Motion because both arguments fail upon inspection.

23  / / /

24  / / /

25  

26  [4] As noted above, Defendants sought to re-brief previously filed *Daubert* motions (and to submit new

27  ones) by insisting they could provide on-point California and Ninth Circuit authority that contradicted the

28  MDL Court's rulings.  This Court granted Defendants' requests based on those representations, despite the time and resources that filing the new motions would involve.  But when all was said and done, Defendants failed to provide any of the on-point, binding, MDL-contradicting authority they promised.

### 1.   Statute of Limitations

"California Civil Procedure Code § 335.1 sets a two-year statute of limitations on personal injury claims based upon defective products . . . ."  *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 893 (N.D. Cal. 2013).  Under the "discovery rule," that two-year clock does not begin ticking "until the plaintiff discovers, or has reason to discover, the cause of action."  *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005).  This occurs when a plaintiff becomes "aware of her injury, its factual cause, and sufficient facts to put her on inquiry notice of a negligent cause."  *Clark v. Baxter Healthcare Corp.*, 100 Cal. Rptr. 2d 223, 228 (Ct. App. 2000), *as modified on denial of reh'g* (Oct. 20, 2000).  Courts thus "look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them."  *Fox*, 110 P.3d at 920.  In the products liability context, the question is whether a plaintiff has reason to suspect that her injury was caused by "wrongdoing involving a product's defect."  *Id.* at 924.

Defendants contend Plaintiff both should have suspected alleged wrongdoing and actually suspected wrongdoing more than two years before initiating this action.  With respect to the discovery rule, however, summary judgment is properly granted only where "the uncontradicted facts are susceptible" to "one legitimate inference."  *Simpson v. Robert Bosch Tool Corp.*, No. 12-CV-05379-WHO, 2014 WL 985067, at *2 (N.D. Cal. Mar. 7, 2014) (citing *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 928–29 (Cal. 1988)).  Here, the record is not as one-sided as Defendants pretend.

As to what Plaintiff "should have" known, the question is not whether she "knew that the particular product[] injured her," but whether she was "on inquiry notice that *wrongdoing*, such as *defective design of the product*, caused [her] injuries."  *Id.* at *3 (emphasis added).  Defendants note Plaintiff (1) "began asking around" after noticing that her left hip "didn't feel right" a month after her May 2008 surgery, *see* ECF No. 123-2 at 11:16–22; and (2) underwent revision surgery in May of 2009, ECF No. 123-6 at 88:3–19; but (3) did not initiate this action until November 18, 2011.  However, "that an operation does not produce hoped-for results does not signify negligence and will not cause

11

commencement of the statutory period." *Bristol-Myers Squibb Co. v. Super. Ct.*, 38 Cal. Rptr. 2d 298, 302 (Ct. App. 1995), *disapproved of on other grounds by Fox*, 110 P.3d 914.  Notably, Drs. Bugbee and Ball both thought Plaintiff's hip pain was caused by "a metal hypersensitivity," not a defectively designed product.  ECF No. 123-6 at 67:16–19.  The record thus does not uniformly suggest Plaintiff had notice that *wrongdoing* may have caused her injury.  *See, e.g.*, *Clark*, 100 Cal. Rptr. 2d at 230 (denying summary judgment where plaintiff reasonably could have inferred that her injury was caused either by an allergic reaction or by wrongdoing).

Still, Defendants argue, Plaintiff must have actually suspected a product defect, as she consulted two law firms in 2008.  *See* ECF No. 142 at 6.  But the record does not confirm that timeline.  Plaintiff testified that, after she began "asking around," she took the following steps:

> I asked my surgeon if he was aware of any problems with the prosthetic, and then I asked the rep . . . and I was given no, no, no, no . . . .
> So then I -- I just started investigating on my own and reading about it.  And then I went through two different law firms . . . .

ECF No. 123-2 at 11:23–12:6.  A natural way to read this testimony is chronologically, meaning Plaintiff spoke to a DePuy sales representative, *then* began investigating, *before* eventually consulting with two law firms.  And Plaintiff clarified that her "chance meeting" with the sales representative took place in *2010*.  *See id.* at 15:4–18.  Moreover, Plaintiff testified that "[she] didn't know what was wrong with [her] . . . until [she] got an email one day around the beginning of 2010 saying that if [she] had received a DePuy hip prosthetic after 2005, that [she] might be liable [sic] for compensation." *Id.* 10:15–20.  So, it remains possible that Plaintiff's legal consultations occurred in 2010, not 2008.

As a genuine dispute of material fact exists as to when Plaintiff suspected or had reason to suspect a product defect, Defendants could not prevail on their statute of limitations argument even were the Court to accept the untimely Motion.

## 2. Warning Causation[5]

Under California law, a failure to warn claim involves two issues: warning adequacy and warning causation. *See Lopez v. Johnson & Johnson*, 654 F. Supp. 3d 997, 1010 (C.D. Cal. 2023) ("A plaintiff asserting causes of action based on a failure to warn must prove that (1) defendants' 'warnings were inadequate, and (2) the inadequate warnings were a substantial factor in causing plaintiff's harm.'" (quoting *Shahbaz v. Johnson & Johnson*, 2020 WL 5894590, at *17 (C.D. Cal. July 31, 2020))).  Defendants' remaining argument focuses only on the latter.

Regarding warning causation, a plaintiff can survive summary judgment in a failure to warn case only if she presents sufficient evidence establishing that "stronger warnings would . . . have altered the conduct of [her] prescribing physician." *Motus v. Pfizer Inc.*, 358 F.3d 659, 661 (9th Cir. 2004).  This is a function of the learned intermediary doctrine—applicable in cases involving prescription medical drugs and devices—under which a defendant's "duty to warn runs to the physician, not to the patient." *Carlin v. Super. Ct.*, 920 P.2d 1347, 1354 (Cal. 1996) (emphasis omitted).  As the Parties have framed it, the question of warning causation can be asked in two ways: whether a stronger warning would have (1) reached the physician and (2) affected her decision.

Defendants assert that "a different warning would not have affected Dr. Bugbee's decision to use the Pinnacle [MoM Device] because [he] did not rely on DePuy's materials in choosing an implant."  ECF No. 123 at 8.  But the evidence again points both ways. True, Dr. Bugbee testified that he "did not review" the Instructions for Use ("IFU") that came with Plaintiff's implant.  ECF No. 133-2 at 85:13–14.  And he stated he "do[es not] rely on sales reps to give [him] objective evidence of implant performance." *Id.* at 99:16–18.  However, Dr. Bugbee also testified that he had seen DePuy's promotional

---

[5] Defendants present their warning causation argument as applying without distinction to all of Plaintiff's "warning- and fraud-based claims," *see* ECF No. 123 at 6–9, and the Parties' briefs predominantly discuss the issue in relation to failure-to-warn claims.  The Court will follow the Parties' lead and analyze Defendants' argument in the failure-to-warn context.

materials and had "at some point" reviewed the IFU. *Id.* at 95:22–96:12; 104:16–18. So, there is some evidence to suggest that if DePuy's materials had contained a stronger warning, Dr. Bugbee would have encountered it.

Defendants also do not account for the evidence that suggests a stronger warning would have reached Dr. Bugbee even had he not reviewed DePuy's materials. Dr. Bugbee testified that he gets his information through several sources in the "hip and knee replacement community." *Id.* at 120:13–17. Particularly given his "unique situation where [he is] involved at such a high level in [said] community," *id.* at 120:11–13, a reasonable jury could find that Dr. Bugbee would have heard about a stronger warning from his community sources if Defendants had included it in the IFU or its other materials.

Had the content of a stronger warning reached him through the medical community or otherwise, there are indications Dr. Bugbee would have made different choices. Dr. Bugbee reported not being aware of any reason to alert patients to "metallosis"[6] concerns during the relevant period, *see id.* at 100:23–101:1; and stated that if DePuy had information regarding the risks of metal ions "that was not readily available in the community," he would have liked to have known about it, *see id.* 119:14–120:11. Moreover, Dr. Bugbee testified that if Plaintiff came to him today with her 2008 symptoms, he would choose a different implant for her. *See id.* at 120:19–121:8.

The foregoing evidence is sufficient for Plaintiff to survive summary judgment on the issue of warning causation. *See, e.g.*, *Hill v. Novartis Pharms. Corp.*, No. 1:06-CV-00939-AWI, 2012 WL 6004161, at *4 (E.D. Cal. Nov. 30, 2012).

### C.   Conclusion

In sum, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 123). As Plaintiff indicates she will no longer pursue them, the Court **GRANTS** Defendants summary judgment as to Plaintiff's manufacturing defect claim, breach of implied warranty claim, and strict liability design

---

[6] Metallosis can be defined as "[t]he biological reaction to metal debris." ECF No. 139-3 at 72.

defect claim.  Defendants' Motion is otherwise **DENIED** as untimely.

### *DAUBERT* MOTIONS

Defendants move to partially exclude the opinions of Dr. Burstein; Dr. Drumwright; Dr. Naide; Ms. Truman; and Dr. Kessler.  In each of their Motions, Defendants repeatedly insist the Court should put less faith in the MDL Court's rulings in light of the 2023 amendments to Federal Rule of Evidence 702.  The Court will therefore address that issue before turning to the individual Motions.

### I.    The 2023 Amendments to Federal Rule of Evidence 702

Rule 702 was amended in 2023 in two respects.  First, it was changed to "emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets" the Rule's "admissibility requirements."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("FRE 702 Note").  The second amendment was aimed at "emphasiz[ing] that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."  *Id.*

Rule 702's 2023 amendments do not represent the sea change Defendants contend.  The Advisory Committee wished to correct "certain courts" by *clarifying* that Rule 104(a)'s preponderance of the evidence standard applies to each of Rule 702's requirements.    FRE 702 Note.    And applying Rule 104(a) in making *Daubert* determinations is nothing new, as Defendants' own authority confirms.  *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021) (explaining the then-proposed amendments "clearly echo[d] the existing law").  Further, Defendants give the Court no reason to think the MDL Court misunderstood Rule 702's requirements.[7]  The Court thus rejects Defendants' argument pertaining to Rule 702's 2023 amendments.

---

[7] Likewise, Defendants do themselves no favors by asserting that a case should be discounted every time a court reasons that an argument goes more to weight than admissibility.  Yes, it would be an error to hold that "arguments about the sufficiency of an expert's basis *always* go to weight."  FRE 702 Note (emphasis added).  But "[o]nce the court has found it more likely than not that the admissibility requirement has been met, any attack . . . will go only to the weight of the evidence."  *Id.*

## II.   Drs. Albert H. Burstein and Minette E. Drumwright

Defendants first challenge the opinions of Drs. Burstein and Drumwright. Dr. Burstein is a biomechanical engineer with fifty-three years of experience in orthopedic biomechanics. ECF No. 134-1 ¶ 1. Defendants object to his testimony regarding a particle threshold for adverse reactions, the extent of lubrication in MoM hip implants, and DePuy's marketing. *See* ECF No. 124. Meanwhile, Dr. Drumwright has four decades of experience in advertising, marketing, and corporate responsibility. *See* ECF No. 136-2 at 1. Defendants target her opinions on DePuy's marketing; DePuy's conduct in testing and selling the Pinnacle MoM Device; the effect of DePuy's advertising; DePuy's state of mind; and DePuy's relationships with consultants and doctors.[8] *See* ECF No. 126. Defendants unsuccessfully raised all of these arguments during the MDL. *See In re: DePuy Orthopaedics, Inc.* ("*In re DePuy*"), No. 3:11-MD-2244-K, 2016 WL 6271474, at *4–5, *9–11 (N.D. Tex. Jan. 5, 2016).

Defendants previously sought to re-brief their challenge to Dr. Burstein by citing "caselaw from courts within the Ninth Circuit addressing the qualifications of engineers to offer medical causation opinions and the reliability and relevance requirements of Rule 702." ECF No. 106 at 4. But Defendants' Motion does not point to *any* binding on-point authority that contradicts the MDL Court's rulings. Defendants rely heavily on *King v. DePuy Orthopaedics Inc.* ("*King II*"), No. CV-23-00196-PHX-SMB, 2023 WL 8009790 (D. Ariz. Nov. 17, 2023), an action remanded from the same MDL as the instant case. But the *King II* court largely agreed with the MDL Court's holdings, *see id.* at *3–*4, and to the extent *King II* parted with the MDL Court, this Court declines to follow.[9]

---

[8] Defendants also seek to exclude Dr. Drumwright's opinions on "product warning and testing issues." ECF No. 126 at 4 n.1. But as this argument is relegated to a footnote, the Court considers it waived. *See Goldman v. Vigilant Ins. Co.*, 632 F. Supp. 3d 1188, 1196 n.60 (D. Nev. 2022) ("'Arguments raised only in footnotes, or only on reply, are generally deemed waived' and need not be considered." (quoting *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014))).

[9] *King II* precluded Dr. Burstein from testifying "about the *effects* of ions in the body" only because the plaintiff in that case did not contest the issue. 2023 WL 8009790, at *3. And while *King II* also found

Defendants similarly insisted "on-point caselaw from the Ninth Circuit" required new briefs regarding Dr. Drumwright.  ECF No. 106 at 4.  But if Defendants ever found such caselaw, they neglected to provide it.  The only Ninth Circuit specific argument they make invokes a "bar on state-of-mind opinions by experts."  ECF No. 126 at 12 & n.6.  Curiously, though, Defendants cite no cases from the Court of Appeals to support the existence of this "bar."  The few district court opinions cited are distinguishable because here, as noted during the MDL, Dr. Drumwright's opinions are *not* offered as "speculation as to DePuy's state of mind."  *In re DePuy*, 2016 WL 6271474, at *4.

Given the absence of binding contrary authority and the "highly persuasive" nature of the MDL Court's rulings, *see* ECF No 109 at 5, Defendants' Motions regarding Dr. Burstein (ECF No. 124) and Dr. Drumwright (ECF No. 126) are **DENIED**.

## III.   Dr. Steven Naide

Dr. Naide seeks to offer general liability and case-specific opinions, including on medicine and orthopedic surgery.  *See* ECF No. 127 at 1; ECF No. 138 at 1.  He is a board-certified orthopedic surgeon who has been practicing for over thirty years.  ECF No. 138-2 at 1.  Dr. Naide specializes in total joint replacement and typically performs eight joint replacements every week, including hip joint replacements.  *Id.*  He has used the Pinnacle MoM Device and performed revisions on patients who have had MoM prosthetics.  *See id.* at 2.  Dr. Naide also attends medical society meetings addressing topics such as orthopedic devices and patient treatment.  *See, e.g.*, ECF No. 138-3 at 94:22–25; 114:18–115:9.

Defendants ask the Court to preclude Dr. Naide's opinions regarding the risks of systemic illness posed by MoM hip implants, the adequacy of Defendants' testing and marketing, and the adequacy of Defendants' warnings.[10]  *See* ECF No. 127.

---

Dr. Burstein unqualified to opine on Defendants' marketing, *see id.* at *4–5, this Court finds the MDL Court's reasoning on this question more persuasive.

[10] Defendants also argue Dr. Naide should not be allowed to opine on the impact of marketing and warning information on treating physicians.  *See* ECF No. 127 at 16 n.1.  As that argument is underdeveloped and made only in a footnote, the Court declines to consider it.  *See Goldman*, 632 F. Supp. 3d at 1196 n.60.  And in any event, the argument would fail on its merits.  Defendants contend any testimony on the impact

### A.     Risks of Systemic Illness

Defendants first argue Dr. Naide's opinions on the risk of systemic illness allegedly associated with metal wear debris are based on an unreliable methodology.  *See id.* at 4. Specifically, Defendants claim Dr. Naide fails to base his opinions on an identified threshold dose at which metal ions pose an increased health risk. *See id.* at 4–7.  Defendants acknowledge Dr. Naide testified that levels above "normal" are considered toxic, but they fault him for not identifying what "normal" is.  *See* ECF No. 145 at 2.

Defendants' formulation of the reliability inquiry is unduly narrow.  *See King II*, 2023 WL 8009790, at *6 (denying Defendants' challenge to Dr. Naide because "having an *exact* threshold is not necessary").  At bottom, the question is whether "the knowledge underlying [Dr. Naide's opinion] has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano*, 598 F.3d at 565).  Here, Dr. Naide bases his systemic illness opinions on peer-reviewed research, which is cited throughout his expert report. *See generally* ECF No. 138-2.  Even were that not so, his extensive experience with the outcomes associated with MoM hip implants—as gathered through the surgeries he has performed and the patients he has treated—would suffice to establish the reliability of his testimony on this topic. *See King II*, 2023 WL 8009790, at *6.

In the alternative, Defendants argue Dr. Naide's systemic illness opinions are not relevant because they do not fit the facts of this case.  *See* ECF No. 127 at 7–8.  Plaintiff answers that because the threat of systemic illness is part of what makes her MoM implant allegedly harmful, the systemic-illness opinions bear on her design defect claim.  *See* ECF No. 138 at 7.  Defendants reply that as there is no evidence of metal ions in Plaintiff's blood, nothing in the record suggests a risk of systemic illness made the Pinnacle MoM

---

of marketing and warnings on physicians should come from Dr. Bugbee, as only he could explain what information he relied on.  *See* ECF No. 127 at 16 n.1.  But because Dr. Bugbee relies on the medical community for his information, as discussed on page 14, *supra*, the interactions between a company's materials and the members of that community are relevant here.  Further, the Court agrees with Plaintiff that this testimony also bears on the issue of warning adequacy.  *See* ECF No. 138 at 10.

Device dangerous "*to [Plaintiff]*." *See* ECF No. 145 at 6.

Defendants' relevance argument is unpersuasive. Put broadly, whether a product was negligently (*i.e.*, defectively) designed is evaluated by weighing the dangerousness of the design and the cost of a safer alternative. *See Merrill v. Navegar, Inc.*, 28 P.3d 116, 125 (Cal. 2001). Critically, a product's design can be dangerous because it creates the risk of *multiple* harms. When it comes to causation, however, a plaintiff is not required to establish that she suffered from *each* harm the defect can cause. Rather, she need only prove that the *defect* itself caused her injury. *See Scott v. C.R. Bard, Inc.*, 180 Cal. Rptr. 3d 479, 488 (Ct. App. 2014). Here, the Pinnacle MoM's Device's design is allegedly defective because it releases metal wear debris. Per Dr. Naide, that flaw creates the risk of "*many* complications," of which systemic illness is just one. *See,* ECF No. 38-2 at 13 (emphasis added). Accordingly, the specter of systemic illness remains relevant to the dangerousness of the Pinnacle MoM Device's design even if Plaintiff suffered only from other complications.

As the Court finds Dr. Naide's opinions on the risk of systemic illness reliable and relevant to at least Plaintiff's design defect claim, Defendants' request is **DENIED**.

### B. *Testing and Marketing*

Defendants next target Dr. Naide's opinions on DePuy's allegedly inadequate testing and deceptive marketing, arguing he "did not reach those conclusions himself but merely adopted the opinions of [P]laintiff's other experts." ECF No. 127 at 1. Experts are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. Still, an expert witness cannot "simply parrot" the opinions of other experts, *Villagomes v. Lab'y Corp. of Am.*, No. 2:08-CV-00387-RLH, 2010 WL 4628085, at *4 (D. Nev. Nov. 8, 2010), without conducting "an independent investigation of the underlying evidence," *Walker v. Conagra Brands, Inc.*, No 820CV01679FWSKES, 2023 WL 8885148, at *11 (C.D. Cal. Sept. 21, 2023).

Upon review of his report, the Court concludes Dr. Naide adopted other experts' views on the nature of DePuy's testing and the contents of DePuy's marketing without

reviewing the underlying evidence himself.  *See, e.g.*, ECF No. 138-2 at 15 (citing almost exclusively reports from Drs. Burstein and Drumwright as the basis for his opinion); ECF No. 138-3 at 153:3–16 (testifying he adopted Dr. Drumwright's conclusions without reviewing the underlying documents).  Plaintiff's citations to the record do not suggest otherwise.  *See id.* at 157:9–24.  So, the Court **GRANTS** Defendants' Motion to the extent it seeks to preclude Dr. Naide from opining that Defendants' testing of the Pinnacle MoM Device was inadequate or that Defendants' marketing materials were deceptive.

### C.  *Warning Adequacy*

Finally, Defendants argue Dr. Naide's opinions on the Pinnacle MoM Device's IFU are unreliable because, in lieu of reviewing the IFU himself, he relied on Dr. Kessler's report.  *See* ECF No. 127 at 8–10.  But rather than adopting Dr. Kessler's opinions, it appears Dr. Naide merely familiarized himself with the IFU via the summary contained in Dr. Kessler's report, while also reviewing additional records himself.  *See* ECF No. 138-2 at 16–20.  The Court is thus satisfied that Dr. Naide's opinions on the adequacy of the warnings in the IFU—and DePuy's warnings broadly—are his own.  Further, the Court finds Dr. Naide's opinions reliable given his experience as an orthopedic surgeon and his longstanding familiarity with the relevant literature.

Defendants also contend Dr. Naide's warning adequacy opinions are irrelevant because there is no evidence on warning causation.  This argument was unsuccessful when raised in Defendants' Motion for Summary Judgment, and it fails here for the same reasons.  *See supra* pp. 13–14.  The Court thus **DENIES** the Motion as to warning adequacy.

## IV.  **Mari Truman**

Ms. Truman is a biomedical engineer with biomedical and mechanical engineering degrees and over forty years of experience in biomechanics and orthopedics.  ECF No. 139 at 3; ECF No. 139-2 at 3.  Ms. Truman has served as a designer and project manager in the development of prosthetic hips and other implants, created and reviewed orthopedic product warnings and surgical techniques, and helped develop related sales training and surgeon education initiatives.  *See id.* at 3–5.  Ms. Truman has also authored or co-authored

nineteen bioengineering-related presentations; is a registered professional engineer in Ohio; holds twelve patents for orthopedic devices; and is a member of several professional organizations, including the Orthopedic Research Society. *See id.*

Defendants seek to exclude Ms. Truman's opinions that they argue are "parroted" from other experts, as well as her opinions on medical causation; the adequacy of DePuy's warnings and testing; warning causation; DePuy's trainings; the Pinnacle MoM Device's design defects; and DePuy's state of mind and knowledge. *See generally* ECF No. 128.

## A.   Reliance on the Reports of Other Experts

Defendants first ask the Court to exclude the portions of Ms. Truman's report that "inappropriately parrot" the opinions of Dr. Li, who Ms. Truman replaced after his disqualification. *Id.* at 4.   Defendants note Ms. Truman repeats a number of Dr. Li's opinions in her report, sometimes verbatim and other times with minor changes. *See id.* As previously explained, "[a]n expert may not present testimony that merely 'parrots' the opinion of others." *J.V. v. Pomona Unified Sch. Dist.*, No. LA CV-15-07895-JAKMRWX, 2017 WL 11636026, at *22 (C.D. Cal. May 2, 2017).   But one expert can rely on the opinions of others if "other evidence supports his opinion," and "the record demonstrates that the expert conducted an independent evaluation of that evidence." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014).

Upon review of the record, the Court is satisfied that Ms. Truman's opinions are her own.   For one thing, Ms. Truman did not rely solely on Dr. Li's opinions.   Instead, she considered additional evidence, such as Plaintiff's medical records, deposition transcripts, expert reports, scientific literature, and DePuy's records.   ECF No. 139-2 at 8.   The report also notes that Ms. Truman reviewed the documents Dr. Li considered. *Id.* at 7.   And when asked what she did "to independently verify the ultimate opinions from Dr. Li," Ms. Truman answered that she "started from ground zero."   ECF No. 139-4 at 139:4–9. She further testified that she included conclusions shared by Dr. Li only after she came to *agree* with them. *See id.* at 134:21–135:1 (explaining she included language from other reports only where "we were in agreement"); *id.* at 136:15–18 (stating that, as she "was

substituting" in, she thought she should "mirror" Dr. Li's style "*if I agreed with it*" (emphasis added)).  Defendants' request is therefore **DENIED**.

### B.    Medical Causation

Second, Defendants challenge Ms. Truman's medical causation opinions. Specifically, Defendants claim Ms. Truman should not be allowed to (1) attribute the pain Plaintiff allegedly suffered to "adverse tissue reactions . . . to wear debris and metal ions," ECF No. 139-2 at 20; or (2) opine that the wear on Plaintiff's implant was "excessive" and "sufficient" to cause her alleged metallosis, *id.* at 9; ECF No. 139-4 at 109:5.  Defendants challenge these opinions on qualifications-based and reliability grounds.

#### 1.    Qualifications

Defendants argue Ms. Truman is unqualified to opine on medical causation because she is not a medical doctor.  *See* ECF No. 128 at 6.  However, the Court concludes there is no per se rule requiring testimony on medical causation to come from physicians.  The Ninth Circuit is "short on authority" on this issue, and courts elsewhere have reached different conclusions.  *Ream v. United States*, No. 2:17-CV-1141-RAJ, 2019 WL 2578600, at *2 (W.D. Wash. June 24, 2019).  But some courts in this Circuit have recently allowed engineers to opine on medical causation based on their qualifications.  *See id.*  Particularly notable is *Oester v. Wright Med. Tech., Inc.*, which held Ms. Truman could opine on medical causation by relying in part on medical reports *if* she "ha[d] 'extensive experience and expertise in engaging in primary research on the effects of the relevant mechanism.'" No. CV-19-04763-PHX-SPL, 2021 WL 3742439, at *5 (D. Ariz. Aug. 24, 2021) (quoting *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 805 (D. Ariz. 2017)).  This Court finds *Oester*'s formulation persuasive and adopts it here.

Turning to Ms. Truman qualifications, the Court finds a prior decision by the MDL Court instructive.  Defendants sought to preclude Dr. Burstein—a biomechanical engineer—from opining on medical causation.  *See In re DePuy*, 2016 WL 6271474, at *9. Rejecting that challenge, the MDL Court cited "Dr. Burstein's applicable experience in conducting a failure analysis on over 5,000 retrieved devices, and subsequently authoring

a book chapter detailing that procedure." *Id.* at *10.  The same reasoning applies readily to Ms. Truman, who has over forty years of experience developing—and researching the risks of—orthopedic implants, including hip implants.  *See* ECF No. 139-2 at 3–4.

Consequently, the Court finds Ms. Truman qualified to opine on medical causation. To form her conclusions, Ms. Truman asked, "as a biomedical engineer," whether "the different things that occurred or were diagnosed" in Plaintiff's case were "consistent" with the risks—as gleaned through experience and from the literature—associated with MoM devices.  ECF No. 139-4 at 63:2–9.  Put differently, she "follow[ed] the scientific method and rul[ed] in and rul[ed] out causes," *id.* at 62:15–16, which she is qualified to do in this context.  *See Oester*, 2021 WL 3742439, at *5 (finding Ms. Truman qualified given "her extensive experience with [MoM] hip implants and their effects"); *Alonzo v. Biomet, Inc.*, No. 0:21-CV-62232-WPD, 2023 WL 3484192, at *5 (S.D. Fla. Apr. 13, 2023) (same).

### 2.    Reliability

Defendants also argue Ms. Truman's opinion regarding whether the wear on Plaintiff's implant was sufficient to cause metallosis lacks a reliable foundation. Defendants claim Ms. Truman did not (1) "identify how much wear would be needed for such an injury," (2) show Plaintiff's "device experienced wear above that level," nor (3) "conduct or rely on any volumetric wear measurements."  ECF No. 128 at 14–15.

Defendants rely almost exclusively on *In re Zimmer M/L Taper Hip Prosthesis*, No. 18-MC-2859 (PAC), 2021 WL 3475681 (S.D.N.Y. Aug. 6, 2021), but that case is distinguishable.  There, the court excluded Ms. Truman's *design defect* opinions because she identified a range of potential "mismatch" values associated with a product line and *assumed* that the degree of mismatch in the plaintiff's *specific* implant was hazardous.  *See id.* at *7.  But in this case, Ms. Truman does not identify the range of wear exhibited by Pinnacle MoM Devices and assume without more that Plaintiff's implant must have harmed her.  Instead, Ms. Truman relied on her knowledge of the impacts of metal ions associated with MoM implants—again, as gathered from her experience and her familiarity with the literature—and the medical symptoms Plaintiff exhibited.  *See* ECF No. 139-2

at 5–7; ECF No. 139-4 at 112:6–17.  This is sufficient under Rule 702.

Given the above, the Court **DENIES** Defendants' Motion as to medical causation.

### C.    *Adequacy of DePuy's Warnings and Testing*

Next, Defendants argue Ms. Truman's opinions regarding DePuy's warnings and testing are without basis in fact.  *See* ECF No. 128 at 15–16.  Defendants contend (1) Ms. Truman's warning opinions are not grounded in a reliable methodology, and (2) her testing opinions would not be helpful to the jury.  Neither point proves persuasive.

#### 1.    *Adequacy of Warnings*

Per Defendants, Ms. Truman seeks to opine that, in advance of 2006, "DePuy knew or should have known of the increased failure risk data," and that "the reason for the uptick in revisions . . . [was] adverse reactions to . . . metal debris."  ECF No. 139-3 at 17.  Defendants claim said opinion is unreliable because it is based on evidence relating to other products, not the Pinnacle MoM Device.  ECF No. 128 at 9–10.  Defendants further explain that Ms. Truman's failure to address the differences between the products at issue creates "too great an analytical gap" between her data and her opinion.  ECF No. 146 at 6.

The dearth of supporting authority aside,[11] the Court is not convinced.  In her materials, Ms. Truman explains the connection between the various products discussed.  She testified, for example, that though the products differed in some respects, they all contained MoM bearings and consistently resulted in "a lot of adverse reactions."  ECF No. 139-4 at 199:1–8.  She also explained that "early reports of adverse tissue reactions surrounding DePuy's MoM devices, including Ultima, ASR, and Pinnacle" were of the "same type[]" as the "reactions reported . . . in conjunction with the first generation of failed MoM devices."  ECF No. 139-2 at 10.  Further, Ms. Truman's opinion is also based

---

[11] The cases Defendants cite apply different substantive law and legal standards to answer questions that are at best tangentially related to the instant issue.  *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1146–47 (9th Cir. 2012) (affirming Rule 12(b)(6) dismissal where plaintiffs' "allegations that [defendant] 'became familiar with' and was 'on notice' of the defect" were "conclusory"); *Morris v. Biomet, Inc.*, 491 F. Supp. 3d 87, 109 (D. Md. 2020) (holding party failed to cite "sufficient evidence" of actual malice to avoid summary judgment on punitive damages claim).

on her experience, scientific literature, and data regarding DePuy's products. *See, e.g.*, ECF No. 139-3 at 228–29. The Court thus finds Ms. Truman's warning adequacy opinions sufficiently reliable under Rule 702.

### 2. Adequacy of Testing

Defendants also seek to preclude Ms. Truman from opining on whether DePuy adequately tested the Pinnacle MoM Device, arguing she failed to weigh the costs and benefits of additional testing. Leaning heavily on *Zimmer*, Defendants contend that "the fact that additional tests could have been undertaken is not a reliable basis for an opinion that it 'should have conducted' such testing absent consideration of the 'costs and benefits' that it would entail." ECF No. 146 at 7 (quoting *Zimmer*, 2021 WL 3475681, at *9).

Defendants' reliance on *Zimmer* is problematic, however, as that case turned on the application of Idaho tort law. *See* 2021 WL 3475681, at *9. Meanwhile, Defendants do not address whether *California*, in the context of this case, requires discussion of the costs and benefits of further testing in the same manner Idaho appears to. Indeed, Defendants cite *no* California authority in the "testing" sections of their briefs. *See* ECF No. 128 at 10–11; ECF No. 146 at 7. So, to the extent Defendants contend Ms. Truman's testing opinions are irrelevant under California law because they do not consider the costs and benefits of additional testing, their argument is wholly undeveloped and the Court declines to consider it. *See Hibbs v. Dep't of Hum. Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001), *aff'd sub nom. Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003).

Setting *Zimmer* aside, Defendants argue Ms. Truman's testing opinions lack an "objective basis." ECF No. 128 at 10. As Plaintiff puts it, though, Ms. Truman opines on how DePuy did not perform "adequate testing that would have anticipated failures . . . that others in the industry tested for." ECF No. 139 at 13. And in reaching that conclusion, she discussed common testing protocols, *see* ECF No. 139-3 at 145–46; reviewed records from DePuy's testing of the Pinnacle MoM Device, *id.* at 152–53, 158; and compared DePuy's testing to other available tests identified by the literature, *see id.* at 152. Neither Rule 702 nor *Daubert* demand more. *See In re Biomet M2a Magnum Hip Implant*, No. 3:12-MD-

2391, 2017 WL 10845178, at *12 (N.D. Ind. Dec. 21, 2017).

### D. Warning Causation

Next, Defendants take aim at Ms. Truman's opinions on warning causation. They argue she is not qualified to testify about how different warnings would have affected the decision making of orthopedic surgeons. *See* ECF No. 128 at 19. The Court agrees.[12]

Important here is the distinction between warning *adequacy* and warning *causation*. Adequacy goes to whether a product's warning says what it should say or what the industry might expect it to say. Causation, on the other hand, deals with whether an alternative warning would have led physicians to make different treatment decisions. *See Georges v. Novartis Pharms. Corp.*, No. CV 06-5207 SJO VBKX, 2012 WL 9064768, at *11–12 (C.D. Cal. Nov. 2, 2012) (distinguishing "the adequacy of warnings" from the topic of "how treating physicians might react to different labeling").

Conflating these distinct concepts, Plaintiff and the caselaw she cites in her Opposition focus on warning *adequacy*. Indeed, the court in *Diaz-Granados v. Wright Med. Tech., Inc.*, allowed Ms. Truman to opine on adequacy *because* she would not be discussing causation. *See* No. 6:14-CV-1953-ORL-28-TBS, 2016 WL 1337264, *5 (M.D. Fla. Apr. 1, 2016) (distinguishing cases as "Ms. Truman w[ould] not be opining on . . . whether Plaintiff's implanting surgeon would have acted differently had the warning been better"). Meanwhile, courts treat warning *causation* opinions from experts not involved in medicine or a plaintiff's medical care skeptically.[13]

Ultimately, Plaintiff has not met her burden of establishing Ms. Truman's qualifications. While some of the experiences that make Ms. Truman qualified to comment

---

[12] As the Court finds that Plaintiff has not adequately established that Ms. Truman is qualified to testify regarding warning causation, the Court need not address Defendants' alternative reliability argument.

[13] *See Georges*, 2012 WL 9064768, at *12 ("Several cases have excluded speculative expert testimony relating to what decisions the experts thought prescribing doctors would have made if the drugs had different labels."); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 557 (S.D.N.Y. 2004) ("[The expert's] surmising as to what physicians would do with different information is purely speculative . . . ." (quoting *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001))).

on warning adequacy are relevant to warning causation,[14] Plaintiff does not explain why those experiences qualify Ms. Truman to predict what treating physicians would do with different information.  Without more, Ms. Truman's causation opinions seem to amount only to speculation.  Defendants' Motion is thus **GRANTED** as to warning causation.

### E.    *DePuy's Training*

Defendants also seek to preclude Ms. Truman from opining that the risks associated with MoM devices were "not sufficiently highlighted by DePuy in its . . . training materials."  ECF No. 139-3 at 17.  Defendants contend Ms. Truman has no basis to opine on DePuy's training materials because she has not seen them.  ECF No. 128 at 13.

Defendants are correct.[15]  Ms. Truman testified that she had not seen DePuy's training materials and did not plan to opine on DePuy's training efforts.  ECF No. 139-4 at 206:22–207:4.  Plaintiff points to Ms. Truman's reliance in her General Report on testimony from a Dr. Nargol, but the page Plaintiff cites does not seem to discuss DePuy's training.  *See* ECF No. 139-3 at 15.  And regardless, an expert witness cannot parrot the opinions of other experts without independently investigating the underlying evidence.  *See Walker*, 2023 WL 8885148, at *11.  As Ms. Truman apparently never set eyes on the evidence, the Court **GRANTS** Defendants' request to preclude her from opining that DePuy did not sufficiently highlight the risks of MoM devices in its training materials.

### F.    *Design Defect*

Penultimately, Defendants argue Ms. Truman's opinions on the defectiveness of the Pinnacle MoM Device's design are unreliable, as she does not compare the benefits of the Device's design with those of alternatives on the market during the relevant time.  ECF No. 128 at 14.  But it appears Ms. Truman *does* examine the relative merits of the Pinnacle

---

[14] For instance, Ms. Truman has, in conjunction with surgical and medical reviewers, "been involved in both the creation and review of warnings and precautions provided in package inserts and surgical techniques for well over a dozen orthopaedic product families."  ECF No. 139-2 at 4.

[15] As the Court excludes Ms. Truman's training opinions on reliability grounds, the Court does not address Defendants' alternative claim that Ms. Truman is not qualified to testify on DePuy's training.

MoM device and alternative products in her reports. *See, e.g.*, ECF No. 139-3 at 14–15 (considering "National Registry data and multiple case studies" documenting "that the Pinnacle MoM has unacceptably high mid-term and long-term revision rates compared to . . . alternatives"). She also discusses how the cost/benefit analysis between MoM devices and alternatives has changed over time. *See id.* at 206–08. Plaintiff raises these points in her Opposition, *see* ECF No. 139 at 18–19, but Defendants do not respond.

Additionally, Defendants' argument suffers from their apparent aversion to citing California law. Defendants claim, without citation, that "[t]he fact that potential safety or economic costs associated with an alternative design are part of the calculus is precisely why an expert proposing one must weigh and balance those costs against their benefits." *Id.* at 10 n.1. But as Plaintiff—apparently more willing to tussle with Golden State precedent—points out, the relative costs and benefits of various designs are just some of the factors a jury may consider in conducting a risk/benefit analysis in the products liability context. *See Camacho v. JLG Indus. Inc.*, 311 Cal. Rptr. 3d 372, 379 (Ct. App. 2023).

As Ms. Truman relied on relevant data from acceptable sources—including clinical studies, published research, and her experience—to reach her conclusions, Plaintiff has met her burden. Defendants' cases are distinguishable and do not require a different result.[16] The Motion is thus **DENIED** as to Ms. Truman's design defect opinions.

### G. DePuy's State of Mind

Finally, Defendants target the portions of Ms. Truman's report "that attempt to opine on DePuy's state of mind and knowledge." ECF No. 128 at 15. Defendants argue Ms. Truman is merely drawing inferences from the facts of the case, which the jury can do on its own. *See id.* Meanwhile, Plaintiff frames Defendants' objection as going to the

---

[16]. *See Thompson v. Zimmer Inc.*, No. 11-CV-3099 PJS/AJB, 2013 WL 5406628, at *6 (D. Minn. Sept. 25, 2013) (excluding Ms. Truman's design defect opinions as her report showed defendant's product had specific advantages, and she "identifie[d] no basis" for asserting said advantages were outweighed by risk); *Zimmer*, 2021 WL 3475681 at *10 (precluding similar testimony where Ms. Truman "admitted that her proposed alternatives" could suffer from the same issue as defendant's product, and she "lack[ed] data showing" said alternatives "perform[ed] better in the long run").

phrasing of Ms. Truman's testimony.  ECF No. 139 at 20.  Specifically, Plaintiff contends Ms. Truman is not commenting on Defendants' state of mind, but rather is discussing what Defendants knew or should have known.  *See id.* at 20–21.

Plaintiff has the better argument.  While experts generally cannot opine on a defendant's subjective knowledge or intent, *see Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1078 (D. Or. 2013), they may sometimes address what the defendant should have known, *In re Chantix Prod. Liab. Litig.*, 889 F. Supp. 2d 1272, 1303 (N.D. Ala. 2012).  Expert testimony regarding information available to a defendant is "helpful and relevant to determining whether [the defendant] acted reasonably," and "does not improperly comment on [the defendant's] 'state of mind.'" *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1333 (M.D. Fla. 2015).  Such testimony is particularly useful to the jury when the subject matter at issue is technical or complicated.  *See Drake v. Allergan, Inc.*, No. 2:13-CV-234, 2014 WL 5392995, at *6 (D. Vt. Oct. 23, 2014) ("[The expert] may be permitted to testify about another party's knowledge if a jury would not otherwise understand the importance of certain facts . . . .").

Here, Ms. Truman opines not on Defendants' state of mind, but on the information available to them, what they should have known based on that information, and what actions such knowledge should have prompted.  Objections to the phrasing of her testimony are best handled at trial.  Consequently, the Court **DENIES** this request.

## V.   Dr. David Kessler

Plaintiff offers Dr. Kessler as an expert on regulatory issues relating to "DePuy's development, marketing, and labeling" of the Pinnacle MoM Device.  ECF No. 137 at 5. Dr. Kessler has a background in law and medicine, having received his J.D. from the University of Chicago and his M.D. from Harvard.  ECF No. 137-2 ¶ 1.  Dr. Kessler has trained in pediatrics and pharmacoepidemiology at Johns Hopkins Hospital; taught food and drug law at Columbia; testified before Congress regarding federal and state law consumer protection issues; and published several articles on the federal regulation of food, drugs, and medical devices.  *Id.* ¶¶ 2, 4.  From 1990 to 1997, Dr. Kessler served as a

U.S. Food and Drug Administration ("FDA") commissioner, where he was directly involved with the regulation of medical devices. *Id.* ¶¶ 3, 5. Dr. Kessler has also sat on the boards of two pharmaceutical companies and acted as a senior advisor to a private equity firm that owns pharmaceutical and biomedical companies. *Id.* ¶ 6.

In seeking to exclude some of Dr. Kessler's opinions, Defendants target his (1) regulatory opinions regarding DePuy's warnings, (2) opinions on DePuy's ethical responsibilities; (3) factual narratives, (4) opinions on DePuy's knowledge, and (5) systemic illness opinions. *See* ECF No. 129.

### A.    Legal Conclusions and Warning Adequacy

Defendants argue that "whether DePuy's warnings were adequate is for the jury to decide," so Dr. Kessler's opinions on this issue are inadmissible legal conclusions. *Id.* at 6. Plaintiff counters that opinions "embrac[ing] legal issues" are different from testimony on "ultimate issues of law." ECF No. 137 at 10. Per Plaintiff, Dr. Kessler will testify only to the "problems and/or deficiencies with DePuy's warnings by describing how [DePuy's] conduct fell below the appropriate industry standard of care." *Id.* at 11.

Though the Parties neglect to acknowledge as much, the ultimate issues here are defined by California law. In a strict liability failure-to-warn claim, manufacturers are "liable for injuries caused by their failure to give warning of dangers that were known to the scientific community at the time they manufactured and distributed the product." *Carlin v. Super. Ct.*, 920 P.2d 1347, 1348 (Cal. 1996). Meanwhile, a negligent failure-to-warn case requires proof "that a manufacturer . . . did not warn of a particular risk" that a "reasonably prudent manufacturer would have known and warned about." *Id.* at 1351 (quoting *Anderson v. Owens-Corning Fiberglas Corp.*, 810 P.2d 549, 559 (Cal. 1991)). Industry standards are relevant to both theories of liability. *See Sogbesan v. Crown Equip. Corp.*, No. CV 06-5607 GAF (RZX), 2008 WL 11337701, at *2 (C.D. Cal. Apr. 2, 2008).

"In the Ninth Circuit, experts are allowed to testify about industry standards even where the testimony 'relies in part on the expert's understanding of the requirements of law.'" *In re Juul Labs, Inc.*, No. 19-MD-02913-WHO, 2022 WL 1814440, at *14

(N.D. Cal. June 2, 2022) (alterations adopted) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)).  *Hangarter*, a case about bad faith, illustrates the line between proper and improper testimony.  An expert may testify that defendants "deviated from industry standards" to "support[] a finding that they acted in bad faith," but may not "testif[y] that he had reached a legal conclusion that" the defendants "actually acted in bad faith (*i.e.*, an ultimate issue of law)."  373 F.3d at 1016.

Given the above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion as to warning adequacy.  To the extent Dr. Kessler opines that DePuy's warnings were inadequate as a matter of state law, his testimony is improper.  But Dr. Kessler may testify on the problems with warnings or the lack of warnings to help the jury understand the standard of care, even if doing so involves discussing industry regulations.[17]  *See King v. DePuy Orthopaedics Inc.* ("*King I*"), No. CV-23-00196-PHX-SMB, 2023 WL 5624710, at *3 (D. Ariz. Aug. 31, 2023); *see also Drake*, 2014 WL 5392995, at *6 (allowing Dr. Kessler to testify to "compliance with FDA regulations" and "the standard of care for the pharmaceutical industry," but *not* "legal definitions and legal duties under state law").

### B.    *Ethical Responsibilities*

Second, Defendants ask the Court to preclude Dr. Kessler from opining that "medical device manufacturing companies have *ethical* or other extra-legal responsibilities" beyond "the regulatory scheme imposed by the FDA."  ECF No. 129 at 6.  Per Defendants, such opinions reflect only Dr. Kessler's subjective views.  *See id.* at 6–8.

Dr. Kessler's opinions are, however, more grounded than Defendants admit.  A review of the record shows that the "ethics" opinions Defendants identify arise from Dr. Kessler's knowledge of and experience with industry and regulatory standards, not

---

[17] Defendants characterized their argument as going to "Dr. Kessler's regulatory opinions."  ECF No. 129 at 4 (capitalization altered).  The relevant section of their Motion, however, does not discuss any regulations.  In any event, "[t]hat an expert testifies that a defendant violated industry standards or even identified regulations does not mean that the expert is making an impermissible legal conclusion."  *In re Juul*, 2022 WL 1814440, at *14.

from his personal philosophy.  *See, e.g.*, ECF No. 137-2 ¶ 159 ("*Underlying FDA's regulatory framework for medical devices* is the recognition that manufacturers need to be proactive . . . ." (emphasis added)).

Despite Defendants' contrary assertion, "specialized knowledge and experience" can form the basis of a reliably drawn expert opinion.  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).  When an expert seeks to rely on his knowledge and experience, he must explain the link between his conclusions, his "knowledge," and the "investigatory facts and evidence he [is] drawing from."  *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002).  Here, Dr. Kessler drew on his knowledge and experience; applied that expertise to a review of FDA documents, scientific literature, and DePuy's internal records; and formed opinions on whether DePuy's conduct measured up to industry and regulatory standards.  *See generally* ECF No. 137-2.  This passes muster.

Defendants also briefly argue Dr. Kessler's opinions on DePuy's ethical responsibilities are irrelevant because they do not speak to *legal* obligations.  *See* ECF No. 147 at 3.  But as courts have repeatedly explained to Defendants both during and after the MDL, such regulatory- and industry-customs-based ethics opinions bear on the standard of care.  *See In re DePuy*, 2016 WL 6271474, at *5 ("[E]xpert testimony regarding applicable ethical standards may be helpful in cases where . . . the standard of care . . . is not within the ordinary experience of lay persons."); *King I*, 2023 WL 5624710, at *3 (similar).  The Court finds these rulings persuasive and notes that they accord with California law.[18]

Finally, Defendants single out one of Dr. Kessler's opinions, arguing that he erroneously "suggests several times in his expert report that because [MoM] hips were classified as Class III devices, they should have been subject to the [premarket approval

---

[18] *See Howard v. Omni Hotels Mgmt. Corp.*, 136 Cal. Rptr. 3d 739, 752 (Ct. App. 2012) (explaining that when making "due care determinations," juries may consider a manufacturer's "[c]ompliance with regulations, directives or trade custom," among other factors (alteration in original) (quoting *Hernandez v. Badger Constr. Equip. Co.*, 34 Cal. Rptr. 2d 732, 756 (Ct. App. 1994))).

("PMA")] process rather than the § 510(k) process."[19]  ECF No. 129 at 8.  Per Defendants, Dr. Kessler attempts to cast "DePuy's use of the § 510(k) process as somehow inadequate or even nefarious," even though he "acknowledged that the FDA had not formally called for [PMA] submissions from [MoM] device manufacturers" at the relevant time.  *Id.*  But in the section of his Report that Defendants cite, Dr. Kessler merely states that MoM hips were in the class of devices requiring PMAs, and that PMAs had yet to "be called for." ECF No. 137-2 ¶ 94.  After a thorough review of the relevant documents, the Court does not perceive the subtext that Defendants insist is lurking behind Dr. Kessler's words.

Accordingly, the Court declines to exclude Dr. Kessler's opinions on ethical responsibilities, the *accuracy* of which Defendants may dispute on cross-examination.

### C.    Factual Narratives

Defendants also seek to exclude much of Dr. Kessler's "proposed regulatory and marketing testimony . . . because [his] report largely regurgitates factual information and packages it as expert opinion."  ECF No. 129 at 10.  Defendants argue such narrative testimony improperly usurps the jury's fact-finding function and implicates Rule 403's concerns regarding cumulative evidence.  *See id.* at 12.

Defendants' argument is at best premature.  "[E]xpert testimony cannot be presented to the jury *solely* for the purpose of constructing a factual narrative based upon record evidence."  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020) (emphasis added), *aff'd*, 9 F.4th 1102 (9th Cir. 2021).  But the Court cannot distinguish between constructing a factual narrative and "using relevant facts as context for [one's] expert opinions" in a pre-trial vacuum.  *See Wells v. Allergan, Inc.*, No. CIV-12-973-C, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013).

/ / /

---

[19]  The § 510(k) process allowed new devices similar to older devices already on the market to be distributed pending the completion of FDA rulemaking regarding the submission of PMAs.  ECF No. 137-2 ¶ 46.  The § 510(k) process was available where there was no "change in a device compared to its predicate that raise[d] new questions of safety or effectiveness."  *Id.* at 17 n.24.

In short, Dr. Kessler may testify regarding the facts he relied upon in forming his opinions if such facts are relevant, are not cumulative, and do not constitute a mere rehashing of otherwise admissible evidence, *id.*, and any specific objections to narrative testimony must wait for trial.  Presently, Defendants' request is **DENIED**.

### D.    DePuy's Knowledge and State of Mind

Fourth, Defendants contend Dr. Kessler's opinions on what DePuy knew and when DePuy knew it should be excluded, as jurors can make state-of-mind inferences on their own.  *See* ECF No. 129 at 12.  Defendants unsuccessfully raised this argument in challenging Ms. Truman,[20] *see supra* pp. 28–29, and it fails for the same reasons here.  Dr. Kessler opines on what Defendants should have known and done based on his interpretation of internal records and the literature, and such testimony is proper.  *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, No. 15-MD-02599, 2022 WL 18956175, at *4 (S.D. Fla. Dec. 28, 2022).  Defendants' Motion is thus **DENIED** as to Dr. Kessler's opinions on DePuy's knowledge.

### E.    Risk of Systemic Illness

Lastly, Defendants seek to exclude Dr. Kessler's opinions regarding the risk of systemic illness posed by metal wear debris.  Per Plaintiff, Dr. Kessler does not seek to diagnose Plaintiff or opine that she is at an increased risk of a specific illness.  Instead, Dr. Kessler will "opine that in the absence of medical literature foreclosing an increased risk of systemic illness following exposure . . . , patients exposed should continue [to] be monitored by their physicians."  ECF No. 137 at 19.  Defendants, who acknowledge and do not dispute this characterization of Dr. Kessler's testimony, raise qualifications-based, reliability, and relevance challenges.

/ / /

/ / /

---

[20] In terms of subject matter, the testimony of some of the experts discussed in this Order overlap. Defendants did not raise the issue of cumulative expert testimony in their Motions, however, so the Court will not consider the issue at this time.

### 1.   Qualifications

Defendants contend Dr. Kessler, though a physician by training, lacks "expertise in oncology, toxicology, or any other discipline relevant to the supposed systemic effects of metal ions."  ECF No. 129 at 16.  However, Defendants cite cases that primarily support only the uncontroversial idea that a medical degree alone does not make one an expert in all medical specialties.  *See, e.g.*, *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011).  Other cases Defendants cite are inapposite, as they discuss experts precluded from opining on the causes of *specific* conditions *actually* exhibited by plaintiffs. *See, e.g.*, *Nelson v. Matrixx Initiatives*, No. C 09-02904 WHA, 2012 WL 3627399, at *12 (N.D. Cal. Aug. 21, 2012), *aff'd*, 592 F. App'x 591 (9th Cir. 2015).

Analysis of Dr. Kessler's qualifications calls for a healthier dose of nuance than Defendants prescribe.  "An expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand."  *See Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007).  Lacking a toxicology degree is thus not dispositive.  And a review of his report and deposition shows Dr. Kessler's professional experience informs his opinion.  Beyond his prior history of treating patients,[21] Dr. Kessler has an extensive experience in researching, evaluating, and managing the risks posed by medical products and devices.  *See* ECF No. 137-2 ¶¶ 5–6. By way of that expertise, Dr. Kessler is qualified to opine on the potential risks associated with a medical device and whether such risks are worthy of monitoring.

### 2.   Reliability

Defendants claim Dr. Kessler's opinion is unreliable because he lacks scientific evidence of a causal connection between metal wear debris and an increased risk of system illness.  *See* ECF No. 129 at 17.  But Dr. Kessler's opinion arises from the application of the knowledge and expertise discussed above to his review of, *inter alia*, medical and

---

[21] Dr. Kessler stopped "regularly" treating patients in the 2000s, but he is still licensed and "will take care of very complicated patients."  ECF No. 129-3 at 385:1–7.

scientific literature. ECF No. 137-2 ¶ 19. Defendants attack the literature Dr. Kessler relies on as "limited and inconclusive," ECF No. 147 at 9, but the Court is unpersuaded.[22] Besides, Dr. Kessler does not rely solely on the literature; he also considers DePuy's documents and FDA records. *See, e.g.*, ECF No. 137-2 ¶¶ 11, 80, 82, 190. Moreover, Dr. Kessler seeks only to opine that there is sufficient evidence of a risk to warrant some vigilance on the part of patients, not that metal ions caused systemic illness in Plaintiff. *See* ECF No. 137 at 22. Consequently, it is unclear why the Court ought to require Dr. Kessler to provide evidence of a definitive causal link.[23]

As Dr. Kessler's expertise is sufficient to provide—in conjunction with the sources of information he uses—an adequate basis for his monitoring opinion, the Court rejects Defendants' reliability argument.

### 3.   Relevance

Finally, Defendants argue Dr. Kessler's opinions on systemic risks should be excluded as irrelevant and unfairly prejudicial. *See* ECF No. 129 at 19–21. Specifically, Defendants contend that there is no evidence suggesting Plaintiff is at risk of systemic illness, and that any suggestion of the risk of *specific* systemic illnesses—like cancer— would be "unduly inflammatory." *Id.* at 20–21.

/ / /

---

[22] Defendants claim that a 1996 paper Dr. Kessler cites "expressly concedes the causal connection between metal ions and systemic illnesses" is "unknown." ECF No. 147 at 9. That framing is misleading. Per Dr. Kessler, the paper explains that "*[t]here was agreement* that metal particles have potential systemic effects"; it was the risk of *cancer specifically* where "uncertainty remain[ed] and "the[] risks [were] unknown." ECF No. 137-2 ¶ 19 (emphasis added). Even then, the paper states "[i]t is important to notify patients about possible long term risks of cancer due to metallic degradation products." *Id.*

[23] Another of Defendants' arguments lacks teeth for the same reason. Defendants contend Dr. Kessler's opinion does not have a reliable foundation because he fails to offer evidence as to the dosage level of metal that qualifies as toxic. ECF No. 129 at 18. Assuming a specific dosage level is sometimes required to testify to *causation*, Defendants do not acknowledge the difference between an expert (1) testifying that exposure to Substance X caused Disease Y in Patient Z, and (2) opining that the observed risk of Disease Group A associated with Product B means patients who were treated with Product B should not disregard the risk of Disease Group A.

Defendants did not save their strongest argument for last. As an initial matter, the Court has already determined that the general risk of systemic illness is relevant to at least Plaintiff's design defect claim. *See supra* p. 19. And as to Dr. Kessler's more specific monitoring opinion, Defendants fail to respond to Plaintiff's contention—raised in her Opposition—that the need for monitoring bears on her potential damages for "past and future mental anguish." ECF No. 129 at 23. *King I* ruled against Defendants when confronted with that argument. *See* 2023 WL 5624710, at *4. And the Court finds *King I* persuasive in light of the similarities between that case and this one. Indeed, just as "Mr. King testified that he [was] fearful of the possible future consequences of the surgery," 2023 WL 5624710, at *4, Plaintiff testified that she has harbored concerns regarding the risk of systemic illness posed by metal wear from MoM implants for decades, including before she discovered an MoM device was used in her 2008 surgery. *See* ECF No. 123-2 at 127:1–128:16.

Consequently, the Court **DENIES** Defendants' Motion to the extent it targets Dr. Kessler's opinion regarding the risks of systemic illness in general. However, the Court remains cognizant of Defendants' concerns pertaining to the potential for unfair prejudice associated with discussions of *specific* systemic illnesses (*e.g.*, cancer). Testimony on that topic at trial may be limited by Federal Rule of Evidence 403.

## CONCLUSION

In light of the foregoing, the Court:

1) **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 123). Specifically, the Court **GRANTS** the Motion as to Plaintiff's manufacturing defect claim, breach of implied warranty claim, and strict liability design defect claim, and otherwise **DENIES** the Motion as untimely;

2) **DENIES** Defendants' Motion to Partially Exclude the Opinions of Dr. Albert H. Burstein (ECF No. 124);

3) **DENIES** Defendants' Motion to Exclude in Part the Expert Opinions of Minette E. Drumwright (ECF No. 126);

4)     **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Exclude Certain Opinions of Steven Naide (ECF No. 127);

5)     **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Exclude Certain Opinions of Mari Truman (ECF No. 128);

6)     **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Exclude the Opinions and Testimony of Dr. David Kessler (ECF No. 129); and

7)     **DENIES AS MOOT** Plaintiff's Motion to Exclude Certain Opinions and Testimony of Jeremy Bauer, Ph.D. (ECF No. 130).[24]

The Court previously vacated the remaining deadlines in this case pending the resolution of the instant Motions.  ECF No. 125.  After consulting with the Parties, the Court set a new schedule, ECF No. 149, which the Court reiterates and elaborates on below.

| Event | Deadline |
|---|---|
| File Motions *in Limine* | June 17, 2024 |
| File Responses in Opposition to Motions *in Limine* | July 12, 2024 |
| Memoranda of Contentions of Fact and Law and any other action required by Civil Local Rule 16.1(f)(2) | July 24, 2024 |
| Comply with pretrial disclosure requirements of Federal Rule of Civil Procedure 26(a)(3) | July 24, 2024 |
| Meet and take any action required by Civil Local Rule 16.1(f)(4) | July 31, 2024 |
| Submit Proposed Jury Instructions | August 1, 2024 |
| Plaintiff to provide opposing counsel with Proposed Pretrial Order for review and approval | August 7, 2024 |
| Lodge Proposed Final Pretrial Conference Order with the Court | August 14, 2024 |
| Final Pretrial Conference and Motions *in Limine* Hearing | August 21, 2024, at 9:00 a.m. |

**IT IS SO ORDERED.**

Dated:  April 19, 2024

Hon. Janis L. Sammartino
United States District Judge

---

[24] Previously, Defendants designated Jeremy Bauer, Ph.D., as an expert witness, and Plaintiff moved to exclude many of his opinions.  *See* ECF No. 130.  Three days before oral argument, Defendants withdrew their designation of Dr. Bauer and indicated he would not be called at trial.  ECF No. 148.